**In the Matter of the Marriage of Diane TISCHENDORF (now Diane Montgomery), petitioner, Appellant,**

**v.**

**Peter TISCHENDORF, Respondent,**

**William J. Hempel, Appellant.**

No. 51614, 51615.

Supreme Court of Minnesota.

July 9, 1982.

Oppenheimer, Wolff, Foster, Shepard & Donnelly, Thomas P. Kane, Catherine A. Cella and Rupert M. Mitsch, St. Paul, for Montgomery in No. 51614, and for Diane Tischendorf in No. 51615.

Head & Truhn, Jerome Truhn and Thomas V. Seifert, Minneapolis, for Hempel.

Barnett, Ratelle, Hennessy, Vander Vort Stasel & Herzog, James H. Hennessy and Dale M. Wagner, Minneapolis, for Peter Tischendorf.

OTIS, Justice.

This case involves appeals from two related proceedings in the trial court.

The first appeal is from the order of the Ramsey County District Court dated July 25, 1980, denying a motion by appellant Diane Montgomery, formerly Diane Tischendorf, that sought to modify a prior court order. The prior order, dated December 26, 1979, amended a 1977 judgment and decree of dissolution and directed that respondent be allowed visitation with the parties' minor son, Thomas Tischendorf, in both this country and respondent's native West Germany.

The other appeal is from an order of July 25, 1980, denying Attorney William Hempel's motion to intervene and for his appointment as a guardian ad litem for Thomas Tischendorf.

We modify the conditions for visitation prescribed by the trial court but otherwise affirm.

The principal parties to this proceeding, appellant Diane Montgomery and respondent Peter Tischendorf, were married in Minneapolis, Minnesota, on September 8, 1968. Appellant Montgomery is a native citizen of this country and respondent Tischendorf is a native citizen of the Federal Republic of Germany (West Germany). The only child of the parties and the focus of this dispute, Thomas Tischendorf, born December 25, 1970, is a bright and articulate child.

After their marriage, the couple lived in the United States and each pursued graduate studies. In 1969, they moved to Hamburg, West Germany, where Thomas was born. In August of 1974, appellant returned to this country with the child. There is some dispute as to whether the family had planned to reside permanently in West Germany or the United States. After infrequent visits between the two countries, the marriage deteriorated.

In May of 1976, respondent petitioned the German court for a divorce and claimed appellant's desertion as a ground for such divorce. Appellant shortly thereafter instituted divorce proceedings in the Ramsey County District Court. The German court took note of the American dissolution proceeding but concluded that the American court was without jurisdiction. Appellant did not appear or defend in the German proceedings and on March 11, 1977, the German court granted respondent a divorce after determining that appellant was the "guilty" party. After respondent's default in the American proceeding, the Ramsey County District Court issued a judgment and decree on May 17, 1977, that dissolved the marriage and awarded the exclusive custody of Thomas to appellant.

In the period that followed, there were unsuccessful efforts by both parties to work out an acceptable visitation structure. In January of 1979, respondent formally moved for an amendment of the May 1977 judgment and decree of dissolution granted by the Ramsey County District Court in order to secure definite visitation rights. A

later motion in March of 1979 was made by respondent to provide for regular visitation, to determine support obligations and to resolve the issue of property division between the parties. Appellant moved the court to change venue of the case to Hennepin County and to continue the hearing on respondent's motion. Appellant's motion was denied.

After a hearing on respondent's motions, the trial court issued its order dated May 3, 1979, that provided respondent was entitled to visitation both in this country and in West Germany. The order specifically approved a visit to West Germany in the summer of 1980. The May 3, 1979 order also made respondent's visitation rights conditional. These conditions included a requirement that an irrevocable letter of credit in the amount of $10,000 be provided by respondent as an assurance that Thomas would be returned to the custody of appellant and a requirement that respondent execute an agreement acknowledging appellant's right to custody and the jurisdiction of the trial court. Respondent complied with these conditions.

Appellant's concern over whether Thomas could be detained in Germany prompted her to move the court for an amendment of the May 3, 1979 order. That motion was denied and on December 26, 1979, the May 1977 Judgment and Decree of dissolution was amended to reflect respondent's visitation privileges.

Some visitation between respondent and his son occurred in Minnesota during March of 1980. An agreement was also reached by the parties with respect to Thomas' trip to Germany between August 1 and August 22, 1980. The trial court was made aware of the proposal and recommended that objections to the plan be heard on or before June 13, 1980. After meeting with counsel on June 13, 1980, the court ordered that objections to the proposed itinerary be heard on July 14, 1980. Thereafter, appellant moved the court to deny all visitation, specifically that scheduled to take place in Germany.

There was evidence presented at the hearing on appellant Montgomery's motion that suggested respondent could successfully gain custody of Thomas through a German court and prevent his return to this country. Evidence of Thomas' reluctance to travel to Germany and the psychological impact of such a trip on Thomas was also presented by appellant. Respondent countered such evidence with an affidavit from his German counsel that indicated respondent's detention of Thomas in Germany would subject respondent to criminal prosecution. The court also interviewed Thomas about his desire not to travel to Germany to visit his father.

Several days after the hearing on July 14, 1980, appellant Hempel moved the court for an order granting him leave to intervene and for his appointment as guardian ad litem for Thomas. On July 25, 1980, the trial judge issued his order denying both appellant Montgomery's motion and appellant Hempel's motion. These appeals followed.

Respondent's motion in this court to vacate a stay of the lower court order was denied on July 31, 1980.[1]

Appellant Hempel's motion to intervene and for his appointment as guardian ad litem was denied by the trial court because (1) Minn.Stat. § 518.165 required such denial, (2) the motion was untimely, and (3) the child's interests were adequately represented.

Minn.Stat. § 518.165 (1980) concerns the appointment of guardians in dissolution proceedings and provides as follows:

In all proceedings for child custody or for dissolution or legal separation where custody or visitation of a minor child is in issue, *the court may appoint a guardian ad litem from a panel established by the court* to represent the interests of the child. The guardian ad litem shall advise the court with respect to custody, support

1. Respondent has also moved for an order to expand the record before this court to include certain additional evidence. Because the submitted evidence would not aid the court in the disposition of this case, that motion is hereby denied.

and visitation. The court may enter an order for costs, fees and disbursements in favor of the child's guardian ad litem. The order may be made against either or both parties, except that any part of the costs, fees, and disbursements which the court finds the parties are incapable of paying shall be borne by the county. (Emphasis added.)

■ The language of the statute clearly contemplates that the court can, in its discretion, appoint an *independent* guardian. Appellant Hempel was selected by appellant Montgomery, was not a member of the panel referenced by the statute, and therefore cannot be considered to be a disinterested party.[2]

■ In addition, appellant Hempel's motion was brought on July 23, 1980, only a few days prior to Thomas' scheduled departure for Germany. No attempt to secure a guardian for the child was made throughout the proceedings conducted in 1979 or the first half of 1980 when issues of visitation were addressed. Because of this delay, the trial court determined the motion to be untimely. Minn.R.Civ.P. 24.01 expressly provides that intervention will be permitted "[u]pon timely application" of an interested party. Given the circumstances, the trial court correctly denied appellant Hempel's motion to intervene because it was not timely made.

The trial court also concluded that the child's interests in this proceeding were adequately represented and therefore intervention by a guardian was not warranted. While we hold that appellant Hempel's motion was properly denied for the reasons stated above, our disposition of this case

2. Appellant Hempel contends that section 518.-165 is not the only method by which a guardian may be appointed. He argues that Minn.R. Civ.P. 17.02 is also applicable to this case and that the trial court erred in not proceeding under that rule. Rule 17.02 *requires* the court to appoint a guardian if a minor or incompetent is not represented in a pending action. The application of this rule to dissolution proceedings whenever visitation is an issue would require all children to have court-appointed guardians. The rule was not intended to have such a result.

may prompt the trial court, on remand, to select an independent guardian pursuant to section 518.165 to assure that Thomas' interests are adequately represented. Our decision as to this issue merely forecloses an attempt by either party to select counsel to serve as guardian.

■ Respondent asserts that appellant Montgomery failed to make a timely appeal of the trial court's visitation determination and, therefore, this court is without jurisdiction to hear the appeal. In Minnesota, the failure to make a timely appeal is a jurisdictional defect. Minn.R.Civ.App.P. 126.02; *see Schaust v. Town Board of Hollywood Township*, 295 Minn. 571, 204 N.W.2d 646 (1973) (per curiam).

Appellant Montgomery did not seek review of the May 3, 1979 order granting visitation privileges to respondent, the June 7, 1979 order confirming the May 3, 1979 order, or the December 26, 1979 amendment of the original judgment and decree of dissolution that permitted visitation by respondent. The appeal from the July 25, 1980 order denying appellant Montgomery's request for modification of the visitation rights of respondent was timely, however.

Respondent's contention is that the motion that resulted in the July 25, 1980 order and the appeal generated by that order constituted an attempt by appellant to delay the scheduled visitation. Procedural tactics such as that alleged by respondent are not permitted. *McCrank v. McCrank*, 239 Minn. 488, 59 N.W.2d 309 (1953).

Minn.Stat. § 518.175, subd. 5 (1980) concerns the review by the trial court of previous visitation orders and provides as follows:

In addition, Minn.R.Civ.P. 81.01(1) provides that the Rules of Civil Procedure are not applicable to proceedings instituted under Minn. Stat. ch. 518 insofar as the rules are inconsistent or in conflict with these statutes. The fact that section 518.165 specifically deals with the appointment of a guardian under different conditions than those set forth in Rule 17.02 compels a conclusion of inconsistency between the two provisions. This inconsistency renders the rule inapplicable to dissolution proceedings under Rule 81.01(1).

The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation is likely to endanger the child's physical or emotional health or impair his emotional development. If the custodial parent makes specific allegations that visitation places the custodial parent in danger of harm, the court shall hold a hearing at the earliest possible time to determine the need to modify the order granting visitation rights. The court may require a third party, including the county welfare board, to supervise the visitation or may restrict a parent's visitation rights if necessary to protect the custodial parent from harm.

■ This provision makes it clear that a court can entertain a request for modification of visitation orders when changed circumstances suggest the child may be physically or emotionally harmed by visitation. *See Moss v. Moss*, 274 Minn. 362, 143 N.W.2d 844 (1966). Appellant's motion contained allegations of such a change in circumstances. Appellant cited the boy's fear of his father, the failure of respondent to develop a healthy father-son relationship, and the detrimental impact on the child should he be detained in Germany. These allegations were sufficient to permit the trial court to hear appellant's motion and for her to seek a review in this court of the denial of that motion.

Because appellant's July 1980 motion was properly before the trial court and the appeal from the denial of that motion was timely, this court has jurisdiction to hear the appeal.

Respondent contends that appellant did not address the constitutional issues in the court below and that the failure to raise such issues in the trial court prevents this court from addressing those issues. *Tour-*

*ville v. Tourville*, 292 Minn. 489, 198 N.W.2d 138 (1972) (per curiam).

■ Appellant correctly points out that the constitutional issues were raised in her July 1980 motion. There is also authority for the proposition that constitutional rights can be asserted on appeal when the interests of justice require consideration of such issues, when the parties have had adequate time to brief such issues, and when such issues are implied in the lower court. *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Walters v. Common School Districts*, 265 Minn. 284, 121 N.W.2d 605 (1963); *Laufenberg v. Cosmetology Examining Board*, 87 Wis.2d 175, 274 N.W.2d 618 (1979).

■ The fact that the constitutional issues were raised in appellant's July 1980 motion, that all parties have briefed the issues, and that there is at least a suggestion that the child may never be returned to this country are sufficient to justify this court's consideration of the constitutional questions presented.[3]

■ The constitutional right asserted by Thomas in this case is the right not to be compelled to leave the territory of the United States. It cannot be disputed that such a right exists in an adult citizen of this country.

■ While children do possess constitutional rights, some of those rights may not become operative unless it can be demonstrated that the child can exercise them intelligently.

In *Acosta v. Gaffney*, 558 F.2d 1153 (3d Cir. 1977), the court was concerned with an action instituted by an infant to stay the deportation of her Columbian parents. The child was born in this country while her parents were illegally residing here. It was alleged that the deportation of the child's parents would be an unconstitutional deprivation of her rights and privileges as a native-born American citizen. The *Acosta*

---

**3.** Respondent also contends, however, that the decision in *Ryan v. Ryan*, 300 Minn. 244, 219 N.W.2d 912 (1974), precludes appellant from raising her constitutional claim. We need not address this point, however, as we have determined that appellant's arguments that her constitutional rights have been violated are without merit.

court recognized the existence of a constitutional right to travel or not to travel. However, the court indicated that such a right does not mature in an individual until he or she can exercise it intelligently. In reaching this result, the court stated:

The constitutional right upon which Lina relies is somewhat broader than she describes it. It is the fundamental right of an American citizen to reside wherever he wishes, whether in the United States or abroad, and to engage in the consequent travel. [Citations omitted.] It is the right to exercise a choice of residence, not an obligation to remain in one's native country whether one so desires or not, as is required in some totalitarian countries. In the case of an infant below the age of discretion the right is purely theoretical, however, since the infant is incapable of exercising it * * *.

\* \* \* \* \* \*

The right of an American citizen to fix and change his residence is a continuing one which he enjoys throughout his life. Thus while today Lina Acosta, as an infant twenty-two months of age, doubtless desires merely to be where she can enjoy the care and affection of her parents, whether in the United States or Columbia, *she will as she grows older and reaches years of discretion be entitled to decide for herself where she wants to live and as an American citizen she may then, if she so chooses, return to the United States to live * * *.* [Emphasis added.]

558 F.2d at 1157–8.

In *Bergstrom v. Bergstrom*, 296 N.W.2d 490 (N.D.1980), the North Dakota Supreme Court was presented with the question of whether an 8-year-old girl had a constitutional right not to be compelled to reside with her mother in Norway. The *Bergstrom* court did not decide the constitutional issue because it was determined that the lower court erred in concluding that residence in Norway was in the best interests of the child.

We are of the opinion that this boy, at the age of nine years, lacked the ability to assess the value of building an enduring relationship with his father. The appellant suggests that during the visit with Thomas in 1979 and 1980 that his father told him there were excellent schools in Germany and made it clear, at least to the boy, that respondent's intent was to keep Thomas in Germany once he arrived there on visitation. The precise dialogue between counsel, the court, and Thomas was this:

MR. KANE: Did he talk to you about going to school during visitation, the three weeks you were over there?

THOMAS: Yes.

\* \* \* \* \* \*

MR. KANE: Did he talk about going to school in the winter too?

THOMAS: No. He just said I would go the three weeks.

\* \* \* \* \* \*

COURT: * * * * Now your father has not had a lot of contact with you over the years, but one thing you ought to know, one of the reasons for that is at about the time you were between five and six another judge ordered, issued what is called a court order which forbids or forbade your father from contacting, seeing or visiting with you. I didn't do it and we don't have to go into details why it was done; but to some extent the fact that he has been neglectful has been in accordance with an order of this court. That is why you haven't heard from him; but you should know that.

What I want to do is in your best interests. It may or may not be exactly what you want to do.

I am wondering whether your concern about going to Germany is mostly you don't want to go or mostly you are afraid your father won't send you back and you will have to stay there?

THOMAS: Because I am afraid that he might not send me back here.

COURT: Okay. Is that mostly because he showed you pictures of your room or the house and talked about the schools?

THOMAS: Yes.

COURT: That scares you a lot?

THOMAS: Yes.

In a matter of such critical importance as the bond between father and son, the findings of a trial judge who, in his words, has "agonized" over his decision, should not be lightly set aside or ignored. The court noted:

It is impossible for Thomas' father to re-establish a meaningful relationship with Thomas by brief visits in the United States. Unless there is an extended visit this year it is unlikely that the erosion in Thomas' perception of his father can be checked.

The court is aware that Thomas does not feel like going to Germany this year. However, it often occurs in the lives of parents and the courts that children do not want to do what is deemed best for them. Thomas' real fear is not of *visiting* Germany but of being *detained* in Germany. This is a genuine fear, and the court is concerned about it. The court believes, however, that he will be returned safely to the U.S. and will be better for the experience.

■ In assessing the validity of the concerns expressed by Thomas, several factors of critical importance should be kept in mind. In March of 1980 Mrs. Montgomery voluntarily entered a formal stipulation as follows:

b. Summer, 1980, respondent shall have visitation in Germany for a period of twenty-two (22) days which shall be exercised at a time selected commencing during the period of the last week of July, July 28, 1980, through the first week in September, 1980."

Thomas's mother at that time apparently had no misgivings concerning the likelihood of Dr. Tischendorf's returning their son to America. It is a reasonable assumption that the initiation of adoption proceedings by Thomas's stepfather triggered Mrs. Montgomery's reluctance to fulfill the commitment she made in her earlier stipulation.

It is essential, also, not to lose sight of the fact that we are not dealing with a custody matter but only with visitation rights. What may be in the best interests of Thomas as to the former status do not necessarily apply to the latter.

The trial court, having before it all the evidence, made a finding that "the court believes, on the basis of [Dr. Tischendorf's] demeanor, his personal situations, and all the evidence, that he will return the child. * * * * The court is satisfied that Dr. Tischendorf will return Thomas to the United States at the end of August and that no further security is required."

Thomas was born in Germany and his father and grandparents reside in that country. He himself spoke German fluently as a small child. Although his mother also had a competent command of spoken German, she has permitted her son's grasp of that language to lapse. It hardly seems necessary to rely on the testimony of experts to determine whether or not a son can derive benefits from cultivating a relationship with his natural father, particularly where the father is a person of good character, highly educated, in a responsible professional position, and is reaching out to encourage his son's pride in his roots. To deny Thomas an opportunity for exposure to the family and culture of his European forebears is not in his best interests, if adequate safeguards are imposed to guarantee his return.

Accordingly we affirm the trial court's decision to permit Dr. Tischendorf to visit with his son in Germany for three weeks during the summer months, but remand for the trial court to include the following conditions: (1) increase the letter of credit to Mrs. Montgomery from $10,000 to a larger amount; (2) require Dr. Tischendorf to furnish round-trip transportation for an adult companion to accompany Thomas to Germany; (3) require Dr. Tischendorf to obtain an order from an appropriate German court which will recognize the exclusive jurisdiction of American courts for determining Thomas's custody and which acknowledges the duty of German courts to enforce appellant's right to custody, subject to respondent's stipulated right of visitation.

Remanded.

KELLY, J., took no part in the consideration or decision of this case.

YETKA, Justice (dissenting in part).

I concur with the majority opinion insofar as it remands to the trial court for consideration of the four conditions set forth therein. I would hold, however, that there is a constitutional right not to be compelled to leave this country, based on the right to travel and as a fundamental incident of citizenship. *See, e.g., Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). Once outside the territory and jurisdiction of the United States, a citizen is deprived of the guaranty of the rights and liberties accorded by our constitution. This consideration is particularly applicable in this situation where it is possible that the respondent could gain custody of Thomas in West Germany and prevent his return to the United States.

Moreover, the mere fact that a citizen is a minor does not deprive him of his constitutional rights. Specifically, if Thomas demonstrates the maturity, capacity and intelligence to make an informed decision, he should be allowed to do so. *See Belloti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). Alternatively, if Thomas is not found to be mature enough to make the decision, then I would hold that, under these facts, where there is a contest between the natural parents, the trial court must appoint an independent guardian ad litem to represent the boy's interest. Thomas is admittedly bright and articulate, yet the majority denies him the ability to decide for himself. When this case first reached us, Thomas was only 10 years old. He is now 11 and will be 12 later in the year. I would remand the question of Thomas' ability to decide for himself, based on considerations of maturity, intelligence and age, to the trial court. If the trial court still is of the opinion that Thomas is incapable of deciding for himself, I would require the trial court to appoint an independent guardian under Minn.Stat. § 518.-165 (1980).

I should also add that I cannot see how it is in the best interests of either the child or his parents to force Thomas to visit West Germany at this time. The father is able to visit Thomas in this country, as he has done. Moreover, as Thomas becomes wiser and more mature, he may wish to travel to West Germany to visit his paternal grandparents and his father. If he is forced to do so now, however, the mandatory nature of his travel may extinguish his desire to visit West Germany in the future. Rather than help build an enduring relationship with his father, forcing the issue at this time might have the opposite effect and result in resentment.

WAHL, Justice (dissenting).

I must respectfully dissent. On the record before this court it is evident that the order of the trial court is based on an implicit but clearly erroneous finding of fact that visitation in Germany for 3 weeks during the summer months would be in the best interests of the child, Thomas, at this time. It is true, and the majority opinion places great emphasis on the fact, that Diane Montgomery, the custodial parent, after entry of judgment providing for visitation, agreed by formal stipulation in March of 1980 that Peter Tischendorf would have visitation with his son for 3 weeks in Germany during the summer of 1980. It is also true, however, that, before that proposed visitation, Thomas was reinterviewed by Dr. Kenneth A. Perkins, a licensed clinical psychologist who had seen Thomas several times since April of 1979, and Dr. James H. Gilbertson, a second licensed and highly qualified clinical psychologist. Both psychologists concluded, in affidavits presented to the court, that the scheduled visitation would not be in the child's best interests because of fear and apprehension generated by a perceived threat to detain him in Germany.

The psychologists found Peter Tischendorf not to be the psychologically bonded parent nor to have shown any concern for Thomas' own needs or desires. The court-ordered visitations in this country in 1979 and 1980, before the proposed 1980 summer visitations, had failed to establish the meaningful, trusting relationship between father and son which had been hoped for but

which had had the opposite effect. Dr. Perkins found, after the July 1979 visit, when the father continually lectured and told the boy about his coming to live in Germany and showed him pictures of his "new" German school (which he could scarcely attend in a 3-week visitation period), that Thomas was under severe stress and anxiety as a result and that "forced involvement with this person, particularly long extended vacations away from the family home," would compound his fears and anxieties.

Reviewing the development of the father-son relationship with Thomas in July 1980, Dr. Perkins found the boy's attitude toward his father had changed substantially.

He recalled seeing his father twice, once for ten days in July 1979 and once for two days in March 1980. * * * * His father was still a stranger to him. [But] * * * Tom no longer was neutral or passive in views of his father. He did not want to see his father again. He attributed to his father evil schemes of kidnapping him to Germany and generally expressed that his father had no real warmth or interest in him.

Dr. Perkins found that Peter Tischendorf's plans give very little recognition to Thomas' wants and that his insistence on the German visitation, knowing the child's expressed fears of traveling outside his home area, was insensitive to the child's current emotional and psychological state. In spite of this evidence, the trial court concluded: "It is impossible for Thomas' father to re-establish a meaningful relationship with Thomas by brief visits to the United States. Unless there is an extended visit this year it is unlikely that the erosion in Thomas' perception of his father can be changed." The evidence before the court clearly shows that it is *more* unlikely that the erosion of Thomas' perception of his father will be changed if the visit to Germany is mandated. On the basis of a continuing professional relationship with Thomas and the opportunity to assess the effects of previous visitations with his father, Dr. Perkins concluded that only hostilities and resentment on the part of the child would result from such continued visitation practices.

In reaching a decision the court ignored not only weighty psychological evidence of harm to the child but also the court's own interview with Thomas, who indicated that he was afraid of going to Germany and did not want to go. The focus of a visitation determination must be what is best for the child. In making that determination, the child's fears, whether justified or not, should be given considerable weight, especially when presented in connection with uncontroverted testimony that visitation may be detrimental.

The majority finds that a 9-year-old boy lacks the ability to assess the value of building an enduring relationship with his father and perceives it in Thomas' best interests to be exposed to the family and culture of his German forebears and to take pride in his paternal roots. Nowhere is there evidence, however, that it is in Thomas' best interest to be so exposed at this time in his life when he is feeling threatened and fearful. Dr. Gilbertson expressed his concern at Thomas' nearness to adolescence and his need, more than ever, in that time "to experience the security of language, culture and a meaningful peer group to help articulate final social, emotional and sexual skills." Any major disruption in Thomas' living relationship, Dr. Gilbertson emphasized, particularly a different culture, would, at this point, not be in Thomas' best interests psychologically or socially.

The North Dakota Supreme Court, in *Bergstrom v. Bergstrom*, 296 N.W.2d 490 (N.D.1980), determined that the lower court erred in awarding exclusive custody of an 8-year-old girl to her mother who intended to reside in Norway. The court concluded that the trial judge had not given adequate weight to the child's wishes. The court reasoned that the child was of sufficient age and intelligence to make a rational choice as to her place of residence and that, in light of the child's preference, it was contrary to her best interests to compel her to reside with her mother in Norway. Though *Bergstrom* dealt with custody rath-

er than visitation, the analysis of the *Bergstrom* court is equally applicable here. Both the psychologists' reports indicate that Thomas is a child of above-average intelligence who is capable of making rational decisions. Given Thomas's strongly expressed preference and the uncontroverted reports of appellant's experts, the trial court's determination that visitation outside this country would be in the child's best interests is clearly erroneous.

Certainly a child should know his father and his roots, but this case assumes an unusually troubling aspect because of the evidence presented by Diane Montgomery that the Ramsey County decree giving custody of Thomas to his mother would not be recognized or enforced in West Germany in the event that Peter Tischendorf detains his son in Germany. Tischendorf has filed a written undertaking with the Ramsey County District Court that he will return the child on time and will not seek custody in any foreign court. That undertaking is not worth the proverbial paper it is written on if he changes his mind, as the record indicates he has done on other occasions.[1] Nor is there anything the Ramsey County District Court or this court could do to help Diane Montgomery, an American citizen, retrieve custody of her son, who is also an American citizen.

The detailed exhibits before the court included (1) a copy of the voluminous West German court file which shows, among other items, that Diane was adjudged the sole "guilty party" in the German divorce; (2) the affidavit of Brigitta Bodenheimer, a United States law professor and attorney, licensed in both the United States and West Germany, and the United States delegate to the Hague Conference on International Child Abduction, which explains that under German law only Peter may petition for custody of the German child, Thomas, and that it is highly unlikely that a German court would recognize the Minnesota decree; (3) the letter from the German Consulate General that explains the difficulties of getting any foreign decrees recognized and the specific tests for recognition of a decree, none of which are satisfied by the Ramsey County decree; and (4) the letter from the Department of State detailing how that department has had to deal with "parental kidnappers" and how very little it can do to effectuate the return of any American child detained in a foreign country.

My review of the record persuades me that Diane Montgomery is not seeking to deny Peter Tischendorf visitation with his son or the opportunity to develop a father-son relationship. The record shows that over the years she has sought to facilitate both. She seeks here only to restrict that visitation until Thomas desires it and until the courts of this state will make adequate provisions to insure that Peter Tischendorf will not remove or detain his son outside the United States as he threatened to do in 1976. In affirming the trial court's decision to permit Peter Tischendorf to visit his son in Germany for 3 weeks during the summer months, this court has done the very least it could do to insure Thomas' safe and timely return by increasing the letter of credit from $10,000 to a larger amount and by requiring Peter Tischendorf to furnish round-trip transportation for an adult companion to accompany Thomas to Germany and to obtain an order from an appropriate German court which will recognize the ex-

---

1. Peter Tischendorf has alleged that he does not have now and cannot obtain custody of Thomas under German law, while two experts in German law state that he can easily obtain custody. He has never presented any document to substantiate Diane's custody under German law. He informed the German court in his own divorce proceedings that Diane had abandoned him, that she had taken Thomas out of Germany without his permission and that he never planned to reside in the United States. He acknowledged to the Ramsey County District Court in May 1979 that he had considered moving to the United States, had looked for both a job and a house in Minnesota and that he had arranged for the travel of Diane and Thomas to the United States in 1974. When Diane and Thomas traveled to Germany to see him for 2 weeks in 1975, he sent them off to Spain for 10 days without him.

clusive jurisdiction of American courts for determining Thomas' custody and which acknowledges the duty of German courts to enforce appellant's right to custody, subject to respondent's stipulated right of visitation.

For my part, if we must face the constitutional issue, I agree with Justice Yetka that Thomas possesses a constitutional right not to be compelled to leave the territory of the United States. The record discloses that it has been demonstrated that Thomas can intelligently exercise that right and that he has, in fact, intelligently exercised his right to remain in this country.

I would reverse.