In the Matter of the WELFARE
OF J.R., Jr., and A.I.R.

No. C2–02–378.

Supreme Court of Minnesota.

Jan. 9, 2003.

Brian M. Olsen, Cokato, MN, for Appellant.

Michael J. Thompson, Meeker County Attorney, Gayle A. Borchert, Assistant County Attorney, Litchfield, MN, for Respondent.

Kathryn J. Bergstrom, Christopher A. Carlisle, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, Guardian At Litem.

## OPINION

BLATZ, Chief Justice.

Appellant, the mother of J.R., Jr. and A.I.R., appeals an order of the Minnesota Court of Appeals dismissing her appeal of the trial court order terminating her parental rights. The court of appeals dismissed the appeal because appellant failed

to timely serve the guardian ad litem, a party to the matter, with the notice of appeal within the appeal period. Appellant argues that because termination of parental rights cases are such important cases, a technical violation of the rules of court procedure should not prevent the appeal from proceeding. While we agree that termination of parental rights cases are important, we disagree that the rules of court procedure can be ignored and affirm the court of appeals.

An order was filed by the trial court on February 5, 2002, terminating appellant's parental rights to J.R., Jr. and A.I.R. Because Rule 82.02, subd. 2 of the Rules of Juvenile Procedure requires that an appeal be taken within 30 days, the last day to perfect an appeal was March 7, 2002. On March 7, 2002, appellant timely filed a notice of appeal with the court of appeals and timely served the notice of appeal on respondent Meeker County. Appellant failed to serve the notice of appeal on the guardian ad litem until March 21, 2002, 14 days beyond the 30 day appeal deadline. *See* Minn. R. Juv. P. 82.02, subd. 3(a) (requiring service of notice of appeal on all parties within the appeal period). The court of appeals held that because the guardian ad litem was a party to a juvenile protection matter, dismissal of the appeal was required.

We are now asked to decide whether the failure to timely serve the guardian ad litem deprived the court of appeals of jurisdiction over appellant's appeal. Because jurisdiction is a question of law, the standard of review is de novo. *Harms v. Oak Meadows*, 619 N.W.2d 201, 202 (Minn. 2000).

Before answering the jurisdictional question, it is important to recognize the procedural framework governing juvenile protection matters and appeals. In Minnesota, the Rules of Juvenile Proce-dure govern the procedures for juvenile protection matters in the juvenile courts, including termination of parental rights. Minn. R. Juv. P. 37.01, 38.01(h)(4). As to appeals, the Rules of Juvenile Procedure state that the Rules of Civil Appellate Procedure will apply to appeals of juvenile protection matters, "[e]xcept as provided in Rule 82.02." Minn. R. Juv. P. 82.01.

Rule 82.02 of the Rules of Juvenile Procedure differs from the comparable Rules 104.01 and 103.01 of the Rules of Civil Appellate Procedure in two relevant ways. First, Rule 82.02, subd. 2 provides that in juvenile matters "[a]ny appeal shall be taken within thirty (30) days of the filing of the appealable order." Minn. R. Juv. P. 82.02, subd. 2. This is contrary to the general rule that in civil cases an appeal must be filed within 60 days. Minn. R. Civ.App. P. 104.01, subd. 1. Second, Rule 82.02, subd. 3 further states:

> Within the time allowed for an appeal from an appealable order, the person appealing shall: (a) serve a notice of appeal upon the county attorney and *all parties* or their counsel if represented; and (b) file a notice of appeal, together with proof of service upon all parties, with the clerk of appellate courts and the court administrator.

Minn. R. Juv. P. 82.02, subd. 3 (emphasis added). In contrast, Rule 103.01 of the Rules of Civil Appellate Procedure requires only *adverse parties* be served with notice of the appeal within the appeal period. Minn. R. Civ.App. P. 103.01, subd. 1.

In dismissing this case, the court of appeals did not apply Rules 82.01 and 82.02 of the Rules of Juvenile Procedure. Instead, the court relied on a statute, Minnesota Statutes section 260C.415 (2000), which provides that appeals from final orders in juvenile-protection matters must be taken within 30 days of the filing

of the appealable order and that an appeal from juvenile court is taken to the court of appeals as in civil cases. The court of appeals then applied Rule 103.01, subd. 1 of the Rules of Civil Appellate Procedure, which provides that an appeal is made by filing a notice of appeal with the clerk of the appellate courts and serving the notice on the adverse party or parties within the appeal period. The court of appeals determined that the guardian ad litem was an adverse party and that the failure to timely serve the notice of appeal on an adverse party was a jurisdictional defect requiring dismissal.

▮ While the result here is not affected by the court of appeals' application of the statute and Rule 103.01 (because the 30 day appeal period in statute and Rule 82.01, subd. 2 are identical and because there is no dispute that the guardian ad litem was an adverse party), we nonetheless note that the legal authority relied on by the court of appeals in the order issued in this case is not controlling. We have consistently held that the supreme court has the primary responsibility under the separation of powers doctrine to regulate matters of trial and appellate procedure. *State v. Lindsey*, 632 N.W.2d 652, 658 (Minn.2001); *State v. Olson*, 482 N.W.2d 212, 215 (Minn.1992). Therefore, the Rules of Juvenile Procedure should control over the statute in juvenile protection cases.[1] Accordingly, we hold that under Rule 82.02 of the Rules of Juvenile Procedure, the guardian ad litem should have

been served with notice of appeal by March 7, 2002.[2] Because the guardian ad litem was not served until March 21, 2002, the appeal was not perfected.

Having concluded that the appeal was not timely served on a necessary party, we must then determine what consequences flow from such a failure. We have previously recognized that failure to abide by the rules of procedure deprives this court of jurisdiction to hear the appeal. *See Tischendorf v. Tischendorf*, 321 N.W.2d 405, 409 (Minn.1982); *Kenzie v. Dalco Corporation*, 309 Minn. 495, 497, 245 N.W.2d 207, 208 (Minn.1976); *Schaust v. Town Bd. Of Hollywood Tp., Carver County*, 295 Minn. 571, 573, 204 N.W.2d 646, 648 (Minn. 1973). While the rules do not expressly state that failure to timely file is a jurisdictional defect, the 1998 Advisory Committee Comment to Rule 103.01 of the Rules of Civil Appellate Procedure provides that "[t]imely filing the notice of appeal with the clerk of the appellate courts and timely service on the adverse party are the jurisdictional steps required to initiate an appeal."

Despite this case precedent and the comment to the rules, in a limited number of other cases we have recognized our inherent authority to take an appeal in the interests of justice even when the filing or service requirements set forth in a rule or statute have not been met. *See Ruberg v. Skelly Oil Co.*, 297 N.W.2d 746, 749 (Minn. 1980); *Krug v. Independent School Dist. No. 16*, 293 N.W.2d 26, 29 (Minn.1980);

---

1. In its order, the court of appeals also cited to *In re Welfare of J.B., Jr.*, 623 N.W.2d 640, 642 (Minn.App.2001), for the proposition that failure to serve a party who is not an adverse party is not a jurisdictional defect and does not require dismissal of the appeal. In *Welfare of J.B., Jr.*, the court of appeals stated that Rule 82.02, subd. 3 did not govern but rather Rule 103.01 of the Rules of Civil Appellate Procedure, as set forth in the statute, con-

trolled. *Welfare of J.B., Jr.*, 623 N.W.2d at 642. Because this is incorrect, we overrule that portion of *Welfare of J.B., Jr.* that is inconsistent with this decision.

2. Rule 57.01, subd. 1 of the Rules of Juvenile Procedure expressly provides that the child's guardian ad litem is a party to a juvenile protection matter.

*State v. M.A.P.*, 281 N.W.2d 334, 336–37 (Minn.1979); *E.C.I. Corp. v. G.G.C. Co.*, 306 Minn. 433, 435–36, 237 N.W.2d 627, 629 (Minn.1976). While the seemingly conflicting language set forth in our decisions may create some confusion as to the effect of not following the rules, a review of the cases provides some clarity. When the court has deviated from· the rules or statutes and instead relied on our inherent authority to allow an untimely appeal to go forward, it has been on the basis of peculiar facts, such as recent changes in the law or interpretation issues. *See Ruberg*, 297 N.W.2d at 749 (involving a recent rules amendment permitting appeals from orders for judgment); *Krug*, 293 N.W.2d at 29 (involving question of whether amended order raised a new, previously unappealable issue and whether the appeal period ran from the original order or the amended order); *E.C.I. Corp.*, 306 Minn. at 435–36, 237 N.W.2d at 629 (involving issue of whether appeal began to run from the original order or as amended, corrected order). Importantly, in none of the cases allowing an untimely appeal to go forward did this court make a wholesale exception for a class of cases or do so solely on the basis of simple attorney negligence, inadvertence, or oversight. Rather, it is an exceptional case that merits such a depar-

ture from the rules that we have recognized as jurisdictional and leads the court to invoke our inherent powers.

Relying on this court's willingness to make some, albeit rare, exceptions to the rules of procedure, appellant contends that in the instant case such an exception should be made because "[a]t best we have a technical violation of the rules" and because "[t]here is no prejudice to any party by reason of the insignificant delay of notice to the guardian ad litem * * *." Arguing that dismissal is a harsh result, the appellant urges this court to adopt an analysis similar to Rule 60.02 of the Rules of Civil Procedure, a "good cause" exception to the rules that would excuse the delay and allow the appeal to go forward.[3] We are not persuaded by appellant's argument.

 A good cause exception at the appellate court level would eviscerate the uniform, impartial application of the rules. The rules as a whole are replete with provisions containing definite deadlines specifically "designed to expedite the final resolution of litigation, with due consideration to fairness and certainty of procedure." *E.C.I. Corp.*, 306 Minn. at 435, 237 N.W.2d at 629. Were we to allow simple failure to follow the rules as a good cause

**3.** Rule 60.02 provides that the trial court may relieve a party from a final order, order a new trial, or "grant such other relief as may be just" in the case of "[m]istake, inadvertence, surprise, or excusable neglect." In determining whether or not a trial court should have granted relief under Rule 60.02, this court has traditionally employed a four-prong test. *Nguyen v. State Farm Mut. Auto. Ins. Co.*, 558 N.W.2d 487, 490 (Minn.1997). Under the four-prong test, the party seeking relief must demonstrate: "(1) a reasonable defense on the merits; (2) a reasonable excuse for his or her failure to act; (3) that he acted with due diligence after notice of the entry of judgment; and (4) that no substantial prejudice will result to the opposing party if the motion

to vacate is granted." *Id.* We have serious doubts as to the utility of a Rule 60.02 approach at the appellate level. Rule 60.02 motions are made typically to the trial judge who heard the underlying matter and can evaluate the reasonableness of the excuse, the prejudice to the other party, and whether the party has a reasonable defense. The appellate court is not similarly situated and would not be able to apply a Rule 60.02 analysis without getting into the merits of the case. Further, as noted below, it would be difficult for a party to clear the "prejudice" hurdle in that abused and/or neglected children would have to wait even longer than is required for a permanent home.

exception, the majority of dismissals for failure to timely file and serve a notice of appeal would be appealed and reversed. Such a result would not only delay final resolution of these cases but would also strip the rules of their important function of providing litigants with clear guidelines in which substantive issues can be pursued. Further, if we wanted to avoid this wholesale result by limiting such an exception to child protection cases, we would be in direct conflict with our own policy, as reflected by the rules, that these cases in particular need to be expeditiously handled. *Compare* Minn. R. Juv. P. 82.02, subd. 2 (providing 30 days to appeal juvenile protection matters) *with* Minn. R. Civ. App. P. 104.01, subd. 1 (providing 60 days to appeal in other civil cases).

While it is true that strict application of the rules of procedure may result in some cases not being heard on appeal, equally true is that injustice may result to the children by not enforcing the deadlines set forth in the rules. The dismissal of an untimely appeal does not occur in a vacuum. Each delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home and can seriously affect a child's chance for permanent placement. National Council of Juvenile and Family Court Judges, *Resource Guidelines: Improving Court Practice in Child Abuse & Neglect Cases* 14 (Spring 1995). This simple but alarming truth is widely recognized in literature and has propelled courts across the nation to improve the administration of justice for children. As stated by the National Council of Juvenile and Family Court Judges,

> [t]he prolonged uncertainty for children of not knowing whether they will be removed from home, whether and when they will return home, when they might be moved to another foster home, or whether and when they may be placed

in a new permanent home is frightening. This uncertainty can seriously and permanently damage a child's development of trust and security.

National Council of Juvenile and Family Court Judges, *Adoption and Permanency Guidelines: Improving Court Practice in Child Abuse and Neglect Cases* 5 (Fall 2000). Accordingly, we stand with the appellant in her assertion that these cases are extremely important, but we part company with her singular focus on the parents.

Fundamental to this heightened concern for abused and neglected children is the growing understanding that time for a child is different than time for adults. National Council of Juvenile and Family Court Judges, *Resource Guidelines: Improving Court Practice in Child Abuse & Neglect Cases* 14 (Spring 1995). We need to recognize that from a child's view, a delay is a delay regardless of the reason. To a child, time lost because of innumerable opportunities given to parents to complete a case plan is no different than time lost when courts allow parents more time then is set forth in the rules to perfect an appeal. While we recognize and support due process rights of all parties, we decline the invitation to elevate the parents' rights at the expense of the child's.

In addition to our concern about the effect of unnecessary delay on children, we are troubled by the fact that the guardian ad litem was not served. The importance of the guardian ad litem in the child protection system must be underscored. Guardians ad litem are parties, Minn. R. Juv. P. 57.01, appointed by the court "to protect the interests of the minor." Minn. Stat. § 260C.163, subd. 5 (2000). It is the child's best interests that are the overriding consideration in any termination of parental rights case, Minn.Stat.

§ 260C.301, subd. 7 (2000); *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn. 2001); *In re Welfare of M.D.O.*, 462 N.W.2d 370, 378 (Minn.1990), and it is the guardian ad litem who speaks for the child, Minn.Stat. § 260C.163, subd. 5 (2000). It seems axiomatic that if we are to arrive at a just result in any particular case, the voices of the children must be heard. The failure to serve the guardian ad litem is not merely a "technical violation of the rules" but truly compromises the system's ability to serve the best interests of the children.

Accordingly, we hold that Rule 82.02 of the Rules of Juvenile Procedure is jurisdictional, and because the appeal was not timely served on the guardian ad litem, dismissal is required. The court of appeals order is affirmed.

Concurring in part, dissenting in part, ANDERSON, PAUL H., J., and PAGE, J.

PAUL H. ANDERSON, Justice (concurring in part, dissenting in part).

I concur in part and dissent in part. I do not conclude that appellant Dena Rodacker's two-week delay in serving the guardian ad litem automatically requires the dismissal of her appeal. The majority has determined that failure to serve one necessary party places this action beyond the jurisdiction of our court. This is a too restrictive interpretation of the law, especially in the context of termination of a natural parent's parental rights. We have said "[t]he rules of this court are designed to effectuate the orderly administration of justice and do not control its jurisdiction, for [the court] retains the constitutional power to hear and determine, as a matter

of discretion, any appeal in the interest of justice." *E.C.I. Corp. v. G.G.C. Co.*, 306 Minn. 433, 435, 237 N.W.2d 627, 629 (1976); *see also Krug v. Independent School Dist. No. 16*, 293 N.W.2d 26, 29 (Minn.1980); *State v. M.A.P.*, 281 N.W.2d 334, 337 (Minn.1979). There are times when we must be able to look beyond procedural rules in order to act in the interests of justice. This type of case presents an example of such a time.

While I disagree with the majority and conclude that the court should reach the merits of this case, I understand and appreciate both the legal grounds and policy concerns it addresses. I agree with retired Connecticut Superior Court Judge Frederica S. Brenneman who maintains that "[N]o decision concerning child placement and visitation should ever be made without first estimating the probable impact on the particular child involved of what is proposed to be done." Judge Brenneman said, if decisions do not "minimize the negative impact on that child, they are probably wrong and should not be made." [1] As the majority indicates, expeditious handling of child protection cases, as provided in the rules, is necessary because undue delay in establishing permanency in a child's life can have detrimental effects on the child. Delaying cases beyond the dictates of the rules in order to benefit parents may under many circumstances be prejudicial to the rights of children to have their cases timely heard.

Nevertheless, we need to proceed with caution in this area of the law. We must be wary of a broom that sweeps too broadly and rules that are so strictly enforced that justice has the very real potential of

---

1. Frederica S. Brenneman, retired Judge of the Connecticut Superior Court, *First Do No Harm: Protecting From the Protectors*, Children's Law Center of Minnesota, October 2, 2002. Judge Brenneman's daughter, Amy Brenneman, is the creator, producer, and star of the show "Judging Amy," which is based in part on Judge Brenneman's experiences as a judge.

being denied. This court must retain the flexibility granted to it under our constitution to do what is right despite statutory proscriptions or presumptions. Minnesota Rule of Juvenile Procedure 57.01 expressly provides that the children's guardian ad litem is a party to this matter, and here, the guardian ad litem was not timely served. A strict interpretation of the rules requires dismissal, but the interests of justice require that we reach the merits of this case where Rodacker's attorney timely served notice with the court and the county. Further, unlike the majority, I am not concerned that taking such an approach will open the floodgates. Cases such as this are sufficiently rare to allow us to do our job and address each case on its relative merits. Moreover, we can do so in an expeditious manner so that any detrimental effects on the child are minimized.

Having determined that this case should be decided on its merits, a more detailed account of the facts is required. Dena Rodacker is 36 years old and the natural mother of six children. She has a lengthy history of mental illness, controlled substance and alcohol abuse, and failed attempts at treatment. Since 1990, she has been diagnosed repeatedly with poly-substance abuse and personality disorders and, as recently as 2001, her psychologist reported that she "continues to be significantly chemically-dependent." Her psychologist further noted that she "is very resistant towards accepting her mental-illness/chemical-dependency, and is also very resistant to accepting a treatment program."

Rodacker's parental rights to her four oldest children were involuntarily terminated in two separate proceedings, one in Wright County in 1996 and one in Kandi-yohi County in 1997. Rodacker's attorney was present for trial at the Wright County termination proceedings, but Rodacker did not appear. In the Kandiyohi termination proceedings, Rodacker appeared by telephone for pretrial motions only and did not appear at trial. Rodacker's counsel was at trial, but was allowed to withdraw prior to the trial provided he remained in an advisory capacity, which he did.

Rodacker's fifth child, J.R., Jr., was born on April 13, 1998, and at the time of birth, both J.R., Jr. and Rodacker tested positive for cocaine. Shortly thereafter, Hennepin County initiated a Child in Need of Protection or Services (CHIPS) action and then a termination of parental rights action. Rodacker's parental rights were terminated and J.R., Jr. was placed in foster care. Subsequently, the court vacated the first termination order regarding J.R., Jr. and reopened the CHIPS matter. Nevertheless, J.R., Jr. remained in foster care for more than two and a half years until December 2000, when he was returned to Rodacker. Three months before J.R., Jr. was returned to Rodacker, the CHIPS action was transferred from Hennepin County to Meeker County.

While the Hennepin County CHIPS action was still pending, Rodacker gave birth to her sixth child, A.I.R., on May 4, 2000.[2] Meeker County filed a CHIPS petition on A.I.R. on May 5, 2000. In November 2000, Meeker County dismissed this CHIPS petition without a trial. Rodacker had custody of A.I.R. from birth to May 29, 2001.

On May 29, 2001, Rodacker voluntarily placed both A.I.R. and J.R., Jr. in foster care. She stated that bad things were happening where she lived, including a

---

2. The presumed father's rights to both J.R., Jr. and A.I.R. were terminated and are not an issue in this appeal.

claim that the children had been sexually abused and that she could not keep them safe. Rodacker also admitted that she had been using methampthetamines on and off for nine days. After the children were placed in foster care, Rodacker voluntarily placed herself in the Woodland Crisis Center in Willmar, Minnesota. She was then transferred to the Willmar Regional Treatment Center (WRTC). As a result of the May 29 incident, Meeker County filed a petition for Rodacker's commitment as mentally ill and chemically dependent. On or about June 18, 2001, her psychologist examined Rodacker and submitted a report to the court recommending against commitment. At Rodacker's commitment hearing on June 29, 2001, the petition was dismissed and Rodacker was later released from the WRTC.

After Rodacker's release, plans were made to reunify Rodacker with her children. When the foster parents attempted to return both of the children to Rodacker on July 3, 2001, she would accept only A.I.R. and suggested that J.R., Jr. stay with the foster parents. Two days later, Rodacker had a drug-induced psychotic episode and the police were called. The police took Rodacker and A.I.R. to the police station where Rodacker became upset and ran out. She was subsequently located and charged with disorderly conduct. A.I.R. was returned to foster care and Rodacker was transported to the WRTC.

Following this incident, Meeker County filed CHIPS petitions for both children, and at a hearing on July 17, 2001, Rodacker admitted that her children were in need of protection. Meeker County also filed a second petition for commitment of Rodacker as mentally ill and chemically dependent and Rodacker was committed on July 24, 2001. Rodacker remained at the WRTC from July 6, 2001 until August 22, 2001,

when she was provisionally discharged. After her release, Rodacker violated a number of her conditions of provisional release, including discontinuing her medications without the consent of her treating psychiatrist, missing appointments with the Tri Star Community Action team, and being discharged from an outpatient chemical dependency treatment program because of her disruptive behavior, consumption of alcohol, and smoking marijuana.

On August 7, 2001, a dispositional hearing was held on the CHIPS petitions and Meeker County filed a petition for termination of parental rights. On August 23, 2001, the district court ordered that the children remain in foster care, Rodacker's weekly visitation with the children continue, and a mental health examination be completed on the children. The court also ordered that no further reunification efforts by Meeker County Social Services were necessary based on Minn.Stat. § 260.012(a)(1)(ii) (2001), which provides that rehabilitation and reunification efforts are not required if the parental rights of the parent to another child have been terminated involuntarily.

In December 2001, a trial was held on the petition to terminate Rodacker's parental rights. Sheila Thomas, a licensed psychologist and a state's witness at the trial, evaluated both children to determine their current functioning, their relationship with their foster family, and their sibling relationship. Thomas testified, and the district court found, that initially A.I.R. was indiscriminately sociable and affectionate, but in later sessions was exercising more appropriate caution with new people and situations. Thomas was concerned that A.I.R. would develop attachment-related problems with additional changes in her primary caregivers. Thomas testified that J.R., Jr. appeared anxious, uncertain, and insecure about having a permanent

place to live. She also testified that J.R., Jr. viewed his sister and his foster family as his family and got upset when Rodacker's name was mentioned. In Thomas' view, "another disruption in [J.R., Jr.'s] placement will impact on his ability to form trust relationships with adults." Thomas recommended that both A.I.R. and J.R., Jr. remain with the foster family in an adoptive placement.

The children's guardian ad litem testified that it would be in the best interests of the children to terminate Rodacker's parental rights. Rodacker's own therapist testified that the children should not be returned to Rodacker for at least six months, during which time she would need a number of services. Rodacker testified that she was not "totally mentally [and] emotionally restored from everything that took place" and wanted the children to go to her mother, the children's maternal grandmother. On February 5, 2002, the court filed its findings, conclusions, and order terminating Rodacker's parental rights.

Our standard of review in termination cases is "whether the [district] court's findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether those findings are clearly erroneous." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn.1990). The best interests of the child must be the paramount consideration in a termination of parental rights case. Minn.Stat. § 260C.301, subd. 7 (2001); *Welfare of M.D.O.*, 462 N.W.2d at 375. "Where the interests of parent and child conflict, the interests of the child are paramount." Minn.Stat. § 260C.301, subd. 7 (2001).

The statutory criteria for termination of parental rights are found in Minn.Stat. § 260C.301 (2001). Though only one of the statutory grounds must be met, the district court made findings here that termination of parental rights was warranted on three separate grounds set forth in Minn.Stat. § 260C.301, subd. 1(b)(4) and (5). The court further found that termination of parental rights was in the children's best interests.

The first ground for termination was found under § 260C.301, subd. 1(b)(4), which allows a presumption that the parent is unfit if her rights to other children have previously been involuntarily terminated. Finding that Rodacker had her parental rights to her four oldest children involuntarily terminated in 1996 and 1997, the district court presumed, as a matter of law, that Rodacker was palpably unfit to be a parent. Further, the court found that Rodacker did not rebut that presumption, citing Rodacker's long history and continued issues with mental illness, chemical dependency, and alcoholism as evidence that Rodacker is unable to care for her own physical, mental, and emotional needs or to care for her children for the reasonably foreseeable future.

Rodacker contends that the termination of parental rights orders from Kandiyohi and Wright Counties were insufficient to raise the presumption of unfitness because she was not represented by counsel at either termination hearing. Records of the termination proceedings indicate, however, that while Rodacker failed to appear in both cases, she was represented at the Wright County termination hearing, and her attorney was allowed to withdraw but was ordered to continue in an advisory capacity at the Kandiyohi hearing. Furthermore, it does not appear that the termination orders were challenged on appeal.

Rodacker also contends that her psychologist stated that "with services she is immediately ready to parent the children as of the date of the hearing below and the

months before." However, at trial the psychologist testified that Rodacker was in need of a number of services and that even if she followed the plan established for her treatment, it would be six months before she could be reunified with her children. Rodacker herself testified that she is not "totally mentally [and] emotionally restored from everything that took place." Given Rodacker's continued failures to follow her treatment plans in the past, her psychologist's testimony, and her own testimony, it was not clearly erroneous for the district court to find that Rodacker would not be able to care appropriately for her children in the reasonably foreseeable future.

The district court next found that Rodacker's parental rights should be terminated under section 260C.301, subd. 1(b)(5), which allows termination when reasonable efforts have failed to correct the reason for the out-of-home placement and presumes failure of these efforts when four factors are shown. Applying the first factor that the child has resided outside the parent's home for more than 12 of the last 22 months, the court found that reasonable efforts failed to correct the conditions that led to J.R., Jr.'s placement out of the home. The court found that J.R., Jr. had resided out of the parental home for a total of approximately three years at the time of trial and that, therefore, the first presumption that reasonable efforts have failed was met.[3] The court found that Rodacker of-

fered no evidence to rebut that presumption.

In A.I.R.'s case, A.I.R. was in out-of-home placement for five and one-half months, and thus, the first presumption did not apply. The court found, however, that evidence of Rodacker's continued problems with drug and alcohol use indicated that "the conditions that led to [A.I.R.'s] placement are on-going and unresolved despite reasonable efforts by Hennepin and Meeker County Social Services, law enforcement, psychologists and medical practitioners * * *." Thus, the court also concluded that reasonable efforts have failed to correct the conditions leading to A.I.R.'s placement.

The district court also determined that reasonable efforts have failed to correct the conditions leading to the children's placement under the second half of § 260C.301, subd. 1(b)(5) (2001), which presumes reasonable efforts have failed if:

(A) the parent has been diagnosed as chemically dependent by a professional certified to make the diagnosis;

(B) the parent has been required by a case plan to participate in a chemical dependency treatment program;

(C) the treatment programs offered to the parent were culturally, linguistically, and clinically appropriate;

(D) the parent has either failed two or more times to successfully complete a treatment program or has refused

---

**3.** While the court did not specifically address the other three factors, the findings of fact demonstrate an evidentiary basis to support the conclusion these last three factors were met. As to the second factor, the court's approval of a case plan, Rodacker's social worker testified that Rodacker refused to sign the Meeker County case plans because a "Hennepin County judge had prepared a case plan and she didn't want duplicate plans," thus indicating that there was a court-ordered

case plan for J.R., Jr. in Hennepin County. As to the last two factors, failure to correct conditions leading to out-of-home placement and reasonable efforts by the social service agency to reunite family, the court found, while discussing A.I.R.'s situation, that conditions that led to A.I.R.'s out-of-home placement are ongoing and unresolved and that reasonable efforts have been made to rehabilitate Rodacker and reunify her family.

at two or more separate meetings with a caseworker to participate in a treatment program; and

(E) the parent continues to abuse chemicals.

Specifically, the district court found that Rodacker has been diagnosed as chemically dependent by many professionals over a period in excess of 10 years, that she was required by case plans to participate in chemical dependency treatment programs, and that she was offered programs that were culturally, linguistically, and clinically appropriate. The court further found that Rodacker failed to successfully complete a program more than ten different times, refused multiple times to participate in treatment programs, and continues to abuse chemicals. Rodacker does not dispute these findings. Based upon the complete record and the district court's thorough analysis, the court's finding that reasonable efforts have failed to correct the conditions leading to J.R., Jr. and A.I.R.'s placement is not clearly erroneous.

The district court went on to find that it was in J.R., Jr.'s and A.I.R.'s best interests that Rodacker's parental rights be terminated. Citing *Matter of Welfare of R.T.B.*, the district court found that it must balance three factors in analyzing the best interests of the children: "(1) the child(ren)'s interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child(ren)." 492 N.W.2d 1, 4 (Minn. App.1992). Applying both statutory and case law, the court noted that the parent's

and children's interests are not given equal weight and that the best interests of the children are the paramount consideration. Based on Rodacker's current actions and her history of mental illness and chemical dependency, the court believed that Rodacker would continue using drugs and that as a result, her children would be placed in and out of foster care. Accordingly, and in agreement with the children's psychologist and the guardian ad litem, the court concluded that termination of Rodacker's parental rights was in the best interests of the children. Like the other findings of the court, this finding is not clearly erroneous.

Finally, Rodacker contends that the district court should have ordered the children placed with the children's maternal grandmother under Minn.Stat. § 260C.201, subd. 11(d)(1) (2001).[4] Section 260C.201, subd. 11(d) provides that if a child is not returned to the home, the court must order one of five dispositions, among them permanent legal and physical custody to a relative or termination of parental rights. The statute does not give preference to one option over the other, but requires that the court act in the best interests of the children. In this case, the court found that the best interests of the children require the termination of Rodacker's parental rights. Rodacker provides no evidence supporting her claim that placement with the children's grandmother would be in their best interests.

Based on the reasons articulated by the district court and after reviewing the case on its merits, I would affirm that court's order terminating Rodacker's parental rights to J.R., Jr. and A.I.R.

---

**4.** The Meeker County social worker assigned to this case testified that she talked with the children's grandmother a number of times about taking the children and that the grandmother indicated that she was 58 years old, did not know if she could handle toddlers, and was not certain that her husband would want the children. The grandmother testified, however, that she never told the social worker that she would not take the children and that she believed that the children should be with Rodacker.

PAGE, Justice (concurring and dissenting).

I join in the concurrence and dissent of Justice Paul H. Anderson.