In the Matter of the Welfare of Bradley BROWN, Brenda Brown, Peter Brown, and Scott Brown, Children.

No. 50315.

Supreme Court of Minnesota.

Aug. 29, 1980.

As Amended On Denial of Rehearing Sept. 30, 1980.

McVay & O'Connor and Thomas J. O'Connor, Minneapolis, for appellant.

D. Scott Ballou, County Atty., and William T. Udseth, Asst. County Atty., Chaska, for respondent.

Melchert, Hubert, Young & Sjodin and Mac R. Willemssen, Waconia, guardian ad litem and Counsel for Brown Children, amicus curiae.

PETERSON, Justice.

Appellant sought and was granted discretionary review of an order of the Family Division of the Carver County Court terminating her parental rights to four minor children on the grounds, set forth in Minn. Stat. §§ 260.221(b)(2) and 260.221(b)(5) (1978), that she had substantially and continuously or repeatedly failed to give them

necessary parental care and protection and that, following a determination that the children were neglected, reasonable efforts under the direction of the court had failed to correct the conditions leading to the neglect determination. Prior to filing the petition in this court, appellant appealed to the district court which affirmed the orders after determining that the county court properly admitted several records and reports of medical personnel and social workers into evidence and that the record contained clear and convincing proof of the existence of the statutory grounds upon which the termination order rested. We have reached the same conclusions and consequently affirm.

The children's father, appellant's husband, died in October 1973 while the family was living in Chicago. Both parents had come from Minnesota and appellant shortly moved to Carver County. On March 22, 1976, the Family Division of the Carver County Court adjudged that Bradley, who was born in 1964, Brenda, born in May 1967, Peter, born in March 1970, and Scott, born in June 1971, were neglected upon findings that they were without proper parental care by reason of the faults or habits of appellant; that they were without such care because she neglected or refused to provide it; that she was experiencing emotional problems and had a problem with alcohol to the point that her judgment and ability to provide parental care was lessened; that the children had missed school; and that appellant could not control them.[1] Legal custody of the children was then transferred to the Carver County Family Service Department and was renewed thereafter until February 1978 when the petition to terminate appellant's parental rights was filed.

At the hearing on this petition Mary Herek, a social worker assigned to work with the family in May 1976, testified that she initiated contacts with appellant in response to which appellant said she would cooperate with the agency in order to regain custody of her children. In July 1976 appellant decided to return to live in Chicago and then agreed with Miss Herek that she would try to call or write each child at least once a month and also would try to visit them once a month. In spite of this agreement she had very little contact with the children following her move, although Miss Herek brought Bradley, Peter, and Brenda to Chicago to visit appellant in her home for an overnight visit in June 1977.

The testimony of several social workers established that at the time of the neglect adjudication all of the children were emotionally disturbed to some degree. Peter and Brenda lived with their aunt until November 1977 and received counseling at Wilder Child Guidance Clinic for several months. At the time of the termination hearing, both still required special help in some school subjects but had improved in social adjustment and were adjusting well to foster homes in Ramsey County in which they had been placed when their aunt could not continue to care for them.

The youngest child, Scott, was placed in a foster home following the neglect adjudication, but adjusted poorly. In the summer of 1977 he was referred by the Carver County Family Service Department to the University of Minnesota Hospitals for evaluation and testing because of aggression, hyperactivity, and speech problems. He received evaluation first as an outpatient and then was admitted to the inpatient children's unit for a 6-week period during which a number of professionals in various medical disciplines were involved in his care. Brian Guidera, an instructor in child and adolescent psychology at the University and treatment coordinator in the inpatient unit, testified that his function was to work with those involved in treating a child, his family, and social agencies, and also to coordinate the treatment required for the child. He said those involved in treating the child

---

1. At this time Bradley was living at the Gerard Schools, a facility for emotionally disturbed children, and the other children were being taken care of by an aunt. Appellant's oldest child, Donald, apparently was also not living with her at this time and was not adjudged a neglected child.

made reports of their findings and that he kept such reports as part of the child's medical file in the regular course of activities as a treatment coordinator. Over appellant's objection, a report from the Cleft Palate Clinic stating that the child's speech defect did not result from a physical cause was admitted into evidence. Guidera also testified that he had prepared a discharge summary, admitted into evidence over appellant's objection, which described Scott as having much anxiety about the instability in his life, depression, low self-esteem, and hyperactivity. The discharge summary recommended that Scott live in a residential treatment center which could meet his needs for at least 9 months.

After Scott's discharge from the hospital, he was placed at the Bush Center in accordance with this recommendation. A letter from Guidera to a staff member at the center containing a summary of the information and recommendations of the discharge summary was also received in evidence over appellant's objection. Ramon Reina, a social worker at Bush, testified that a psychological assessment made by a psychologist at the University on August 30, 1977, and an evaluation summary of that date made by the psychologist and a doctor had been forwarded to Bush when the child came there, had been kept in the file relating to Scott since then, and that this was the regular course of practice. These reports, as well as reports from social workers, counselors, a teacher, a psychiatrist, and a speech pathologist who worked with the child after his transfer to Bush, were similarly identified as records regularly kept in the files of children at Bush and were received as business records over appellant's objection.

Reina testified that Scott had become less aggressive and had made progress in his speech, learning, and behavior at Bush, but that the boy still needed structured school and social settings. Dr. Phillip L. Edwardson, a psychiatrist who had interviewed Scott, agreed that he would continue to need more structure than the average child because of his difficulty in controlling his impulses, but felt that ultimately he could

live in a foster home offering a regular routine and consistent limits on his behavior. He foresaw the need of such an environment until Scott reached the end of adolescence.

Bradley, who had been placed at another residential center for disturbed children, Gerard Schools, in January 1976, continued to live there until August 1977. Joanne Barr, a psychologist at that center, testified that Bradley had been first diagnosed by the staff as having a behavior disorder, a diagnosis later changed to depressive neurosis. She said that the boy would become very disturbed when his mother failed to contact him and would sometimes run away. Appellant withdrew him from the center in August 1977 against the advice of the staff, after he had run away and come to Chicago. He lived there with her until December 26, 1977. During this time Jan Budziszewski, a social worker in a private agency which had been contacted by the Carver County Family Service Department through the DuPage County Department of Children and Family Services to assist appellant and Bradley, arranged for a psychiatric examination of the boy. A copy of the psychiatrist's report was received in evidence, again over appellant's objection, following Budziszewski's testimony that it was a correct copy of the report which as a regular practice had been kept in the agency's file. The report stated the examiner's conclusion that Bradley was emotionally disturbed and that the disturbance manifested itself in behavior disorders. In December 1977 Bradley and his older brother were arrested on suspicion of burglary and were subsequently adjudicated delinquent. Appellant complained to the social worker of her inability to control Bradley and conceded at the hearing that she thought he should live in a group home. Budziszewski also expressed the opinion that Bradley was sufficiently disturbed to require institutionalized treatment.

Miss Barr, Miss Herek, and Budziszewski testified that they had encountered considerable difficulty in contacting appellant, although she denied having evaded such

contacts. Budziszewski said that she was often late for or failed entirely to keep appointments with him and that when he first contacted her she had complained that welfare agencies and relatives in Minnesota were making it difficult for her to bring her family together again. She had remarried in January 1977 and complained also of marital problems. Budziszewski expressed the opinions that appellant's ability to respond to and follow suggestions was extraordinarily low, that she is unable to avail herself of offered social services to assist her, and that she is seriously disturbed and had shown disorientation with respect to time, place, and her own person, with resulting lack of energy and strength to carry out intentions to provide a suitable home and environment for her children. He characterized her home situation as chaotic, disorganized, and unsupportive and recommended termination of her parental rights. His report to Carver County Family Services Department, containing essentially the substance of his testimony, was received in evidence as a business record over appellant's objection.

Miss Herek testified that when she brought the children to Chicago in June 1977 she advised appellant to obtain a chemical dependency evaluation and a psychiatric evaluation. Appellant agreed to the latter, although it was never done, but refused to undergo chemical dependency testing and denied that she had an alcohol problem at that time. Miss Herek conceded that she did not have evidence that appellant has had such a problem during the past year. Appellant admitted, however, that she had been arrested for driving while intoxicated in 1975 and in December 1976 and had been placed "in an AA ward" at Ramsey County Hospital during the preceding 2-year period for 3 days pursuant to court order. She said that upon her release she was told that she was not an alcoholic but should get psychiatric help. She said that she had gone to a neurologist-psychiatrist in the past and that if she needed psychiatry, he would have recommended it.

Appellant conceded her inability to control Bradley but said that she felt the other three children should be restored to her care. She said also that Illinois has good facilities if Scott still is in need of special therapy and that she would cooperate with any agency which would give the children help if they needed it. She admitted that she had not complied with Miss Herek's suggestion that she attend parenting classes and said that, on the subject of parenting, "everybody has their own ideas and if that doesn't work something else will." Appellant also said that she had discontinued her telephone in December 1977 because Bradley had been making calls to Minnesota which she could not afford.

The trial court, after considering this evidence, found that it had been proved by clear and convincing evidence that it was in the best interest of each child that a stable home life be established as soon as possible; that Scott and Bradley needed "intense and prolonged care and guidance," and that Brenda and Peter needed "structure and security" in their lives; that following the neglect determination, appellant had been "totally non-cooperative" with the social service agencies here and in Chicago; that she had refused to obtain a chemical dependency evaluation; that she is incapable of providing a stable, secure home life for the children and will not in all probability be able to provide such a home life for them in the future; and that, in order to attain that goal, it is in the best interest of the children to terminate her parental rights. Based on this finding, he determined that the evidence supports termination of appellant's parental rights on the ground set forth in § 260.221(b)(2), "[t]hat the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection," and on the ground set forth in § 260.221(b)(5), "[t]hat following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination."

■ Appellant contends here that the evidence supporting the termination order

was not clear and convincing, the degree of proof required to terminate her parental rights. *Matter of Welfare of Rosenbloom*, 266 N.W.2d 888 (Minn.1978). She claims also that the county court committed reversible error in admitting the medical and social workers' reports described above over objections that Juvenile Court Rules 10–1 and 10–2 precluded their admission and that they were hearsay.[2] In this court appellant urges also that J.C.R. 2–3(1)(c) made these documents inadmissible.[3] The county court held them admissible as records of regularly conducted business activities pursuant to Minn.R.Evid. 803(6).[4] In our view the reports clearly are admissible as business records under this rule in view of the breadth of the definition given "business" therein, so those which were offered as business records and were not used for the purpose of refreshing witnesses' memories were properly received insofar as they related to Scott's physical and emotional problems, as most did, or to Bradley's emotional problems. A few of these reports contained information about the children's family history which appellant claims included derogatory information about her, but we are not persuaded that she was prejudiced thereby since the neglect adjudication included findings reflecting this information. Moreover,

2. J.C.R. 10–1 provides:

(1) A "social study," as used in these rules, is an investigation of the personal and family history and the environment of a child who is the subject of the cause. It may include a reference study, as defined in Rule 10–4(1), and a traffic offense study, as defined in Rule 10–3(1).

(2) The court may order a social study in any juvenile court cause at any time subsequent to the time that the party who is the subject of the cause admits the allegations of the petition, or if he does not admit, at any time subsequent to the time the court finds the allegations of the petition have been proved. For purposes of this rule, the child shall be deemed the subject of a delinquency or traffic offender cause and the parent shall be deemed the subject of a neglect, dependency or termination-of-parental-rights cause.

(3) The report of a social study shall not be admissible in evidence, nor shall it be considered by the court, at the adjudicatory hearing in any juvenile court cause. It shall be admissible in evidence at the dispositional hearing in any juvenile court cause. J.C.R. 10–2 provides:

(1) A "medical examination," as used in these rules, is an examination of a child who is the subject of a juvenile court cause or of his parent by a physician or psychiatrist of a psychologist.

(2) The court may order a medical examination in any juvenile court cause at any time subsequent to the time that the party who is the subject of the cause admits the allegations of the petition, or if he does not admit, at any time subsequent to the time the court finds the allegations of the petition have been proved. For purposes of this rule, the child shall be deemed the subject of a delinquency or traffic offender cause and the parent shall be deemed the subject of a neglect, dependency or termination-of-parental-rights cause. Whenever possible, a medical examination shall be conducted on an outpatient basis. A child held in detention shall be deemed an outpatient. A medical examination of a parent of the child who is the subject of the cause shall not be ordered unless the physical or mental ability of the parent to care for the child is a relevant issue in the particular cause and the parent to be examined consents to the examination.

(3) The report of a medical examination shall not be admissible in evidence, nor shall it be considered by the court, at the adjudicatory hearing in any juvenile court cause. It shall be admissible in evidence at the dispositional hearing in any juvenile court cause.

3. J.C.R. 2–3(1)(c) provides:

(1) In all juvenile court cases, a party shall have the right:

\* \* \* \* \* \*

(c) to inspect any report filed with the court, and if it is admitted in evidence to cross-examine the preparer of such report.

4. Minn.R.Evid. 803(6) provides that the following are not excluded by the hearsay rule, even though the declarant is available as a witness:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

the focus of the reports was clearly on the children's problems and needs and, in Scott's case, his treatment and progress. The incidental references to the children's background were an insignificant element of the reports.

The only exhibit purporting to concern appellant directly was a report of Budziszewski to Carver County Family Services and a memorandum of the understanding between appellant and Miss Herek concerning her agreement to contact and visit the children. These documents were in fact used by their preparers to refresh their recollections, as were a progress summary for Scott prepared by the Bush social worker and a discharge summary and a letter prepared by the Hospital's treatment coordinator concerning Scott. Those reports should not have been received as exhibits. Minn.R.Evid. 803(5). We agree with the district court's conclusion, however, that their reception did not constitute reversible error since the witnesses' testimony concerning their substance was admissible.

Appellant contends, however, that R. 803(6) merely defeats the objection based on hearsay and that the Juvenile Court Rules cited above required exclusion of the reports. We do not determine whether her interpretation of these rules is correct because we have concluded that, even if it is, to the extent that the Juvenile Court Rules are inconsistent with the Rules of Evidence they have been superseded. The scope of the Rules of Evidence is set forth in R. 101, which provides that they "govern proceedings in the courts of this state, to the extent and with the exceptions stated in Rule 1101." Rule 1101 does not except proceedings relating to juveniles from the operation of the Rules of Evidence.

Moreover, proceedings in county court which are not within the concurrent jurisdiction of the district courts are governed by the Rules of Civil Procedure for Municipal Courts pursuant to § 487.23, subd. 1.[5] Section 487.23, subd. 2, permits a county court to adopt rules governing pleading, practice, procedure and forms in civil actions only if they are not inconsistent with other provisions of ch. 487, rules for county courts promulgated by this court, or governing statutes. The municipal courts are bound to apply the Rules of Evidence, so § 487.23, subds. 1 and 2, also supersede any Juvenile Court Rules inconsistent with them. Accordingly, we conclude that the evidence challenged by appellant was properly admitted. We suggest, however, that in future termination proceedings a parent's counsel should avail himself of discovery to avoid surprise. In light of the content of the reports, however, and of the fact that appellant was able to cross-examine the authors of the only ones which related directly to her, she has not sustained prejudice from surprise in this case.[6]

Appellant's contention that the evidence adduced for the termination of parental rights was not clear and convincing must be rejected with respect to the first ground—that she substantially and continuously or repeatedly refused to give her children necessary parental care and protection. We are compelled to hold that the required quantum of proof was presented. It is of course true that once deprived of custody, appellant could not furnish her children the physical care and protection that a custodial parent does. The record establishes, however, that she almost totally failed to keep her commitments to contact her children after July 1976. Even if she was able to make only brief and infrequent visits to Minnesota and could not see each child once a month, as she had agreed she would try to do, she made little or no effort to contact them by letter or telephone. The only child who lived in her home after her move to Illinois was Bradley, and in the 4-month interval he spent with her he had continual

---

5. This proceeding to terminate parental rights is one over which the county court has exclusive original jurisdiction. Minn.Stat. § 487.-14(b) (1978).

6. In fact, she concedes in her brief that the children who are the subject of the reports do have emotional problems and special needs.

difficulties in school, was in conflict with his older brother, and became involved in a robbery. By her own admission she could not control him. The evaluation of the social worker who attempted to work with her and the boy was that she is similarly unable to offer her other children adequate parental care. Although the neglect adjudication had been based in part on her alcohol abuse, she refused to undergo chemical dependency testing; nor did she obtain a psychiatric evaluation or attend parenting classes, both measures which might have enabled her to acquire insight and skills necessary to give her children adequate care.

Our conclusion that the evidence supports termination of appellant's parental rights on the grounds set forth in § 260.221(b)(2) makes it unnecessary to consider appellant's contention that the second ground for termination pursuant to § 260.221(b)(5) was not established because the record contained no evidence that the court had directed any efforts to correct the conditions leading to the neglect determination.

Affirmed.

AMDAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.