# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-0935

In the Matter of the Welfare of the Child of: F. F. N. M., Parent.

**Filed November 27, 2023**
**Affirmed**
**Larkin, Judge**

Hennepin County District Court
File No. 27-JV-22-1832

Brooke Beskau Warg, Hennepin County Adult Representation Services, Minneapolis, Minnesota (for appellant F.F.N.M.)

Mary F. Moriarty, Hennepin County Attorney, Britta Nicholson, Assistant Hennepin County Attorney, Minneapolis, Minnesota (for respondent department)

B.R., Mounds View, Minnesota (pro se respondent)

David Yates, Minneapolis, Minnesota (for guardian ad litem Cheryl Davidson)

Considered and decided by Johnson, Presiding Judge; Larkin, Judge; and Frisch, Judge.

## SYLLABUS

Minnesota Rule of Juvenile Protection Procedure 38.04 authorizes the district court to exclude a parent from a trial on a petition to terminate parental rights, to proceed with the trial in the parent's absence, and to issue a decision on the petition, if the parent engages in conduct that disrupts the trial.

**OPINION**

**LARKIN**, Judge

Appellant mother challenges the district court's order terminating her parental rights. Mother argues that her waiver of counsel was invalid, that the district court violated her right to due process by holding a trial on the termination petition in her absence after excluding her from the courtroom for disruptive conduct, that the district court erred by admitting two exhibits at trial, and that the district court's best-interests analysis is insufficient to sustain the termination of her parental rights. Because we discern no reversible error, we affirm.

**FACTS**

Appellant F.F.N.M. is the mother of I.R.M., who was born in 2016. The child is not eligible for membership in any Indian tribe. In November 2021, mother was examined at a hospital's emergency department based on reports that she had threatened suicide and had a gun in her possession. At the hospital, mother "was uncooperative, and required restraints and sedation." Mother was diagnosed with schizoaffective disorder and transferred to a psychiatric hospital. The child was placed in protective custody.

A petition was filed in Blue Earth County District Court, alleging that the child was in need of protection or services (CHIPS); mother admitted the allegation. The district court found that, on November 16, 2021, mother admitted that her mental-health issues negatively impacted her ability to care for the child and that the department "had additional concerns about [mother's] previous child protection involvement and history as a victim of

2

severe domestic violence while her child was present." The district court adjudicated the child in need of protection or services based on mother's admission.

Later that month, mother was the subject of a separate civil-commitment proceeding. In that proceeding, the district court determined that mother's judgment and behavior are grossly impaired as a result of her mental illness, "which poses a substantial likelihood of physical harm to herself and others." The district court concluded that mother met the criteria for civil commitment. The district court stayed a civil-commitment order conditioned on mother's compliance with several conditions, including:

> (1) Follow all rules, regulations, and conditions of treatment at Prairie St. John's or [any] other facility; (2) Participate in the discharge planning process, successfully complete all treatment aftercare as recommended by the treatment team, and keep all outpatient appointments; (3) Sign all requested releases of information; (4) Take all medications as prescribed; (5) Do not use any nonprescribed, mood-altering substances; (6) Cooperate with the county case manager; and (7) Do not engage in assaultive, threatening, intimidating, or self-injurious behavior, as well as destruction of property.[1]

In January 2022, the underlying juvenile-protection case was transferred to respondent Hennepin County Human Services and Public Health Department (the department) for the convenience of the parties. The department developed a case plan that required mother to (1) abide by all conditions of the stayed civil-commitment order, (2) participate in supervised visitation with the child, (3) support the child's mental-health services and medical appointments, (4) engage in domestic-abuse programming, (5) maintain safe and suitable housing, (6) remain law abiding, (7) participate in parenting

---

[1] Mother's stayed civil-commitment order expired on May 29, 2022.

education, and (8) cooperate with the department, including signing releases of information and maintaining regular contact.

The department offered mother visitation, parenting education, a mental-health assessment, psychiatric and medicinal services, domestic-abuse programming, a referral for housing assistance, and funding for transportation and cellular phone minutes. In May 2022, after the child had been in out-of-home placement for six months, the district court held a permanency review hearing and found that the department had made reasonable reunification efforts and that mother had not substantially complied with her case-plan requirements. In August 2022, the department filed a petition for termination of mother's parental rights to the child. Mother was represented in the proceedings in Hennepin County District Court by an attorney from Hennepin County Adult Representation Services.

In October 2022, the district court held an admit/deny hearing on the termination petition, and mother informed the district court that she wanted to discharge her attorney. The district court explained to mother that if she discharged her attorney from Hennepin County Adult Representation Services, she would not receive a different attorney from that office. The district court warned mother that "child protection matters are very complicated" and "difficult to navigate" and that those challenges are even more difficult for pro se litigants. Mother interrupted the district court, insisting that she be allowed to discharge her attorney and represent herself. The district court granted mother's request.

While entering a denial to the allegations in the permanency petition, mother interrupted the district court's questioning multiple times and yelled at the judge. The district court asked mother more than once to stop yelling. But mother continued, accusing

4

the district court of having already decided that she was unfit to parent the child. The district court had mother removed from the courtroom based on her behavior.

On March 10, 2023, a termination of parental rights (TPR) trial was scheduled to begin before the district court. Mother appeared at the courthouse for trial, but she refused to go through security screening. Even though mother was at the security station on the first floor of the courthouse, the sound of mother's yelling could be heard in the second floor courtroom where the trial was scheduled to occur. Because mother refused to comply with the security-screening process, deputies removed her from the courthouse.

The department asked the district court to proceed by default. The district court granted that request, noting that mother had absented herself from the building by failing to go through proper security checks and screening, as everyone who enters the courthouse must do, resulting in her removal from the building by courthouse deputies. The district court granted the department's request to proceed by default.

Meanwhile, mother managed to bypass security, enter the courthouse at another entrance point, and enter the courtroom where her trial was being held and the department had called its first witness. Despite mother's refusal to comply with security mandates and her apparent unauthorized entry into the courthouse and courtroom, the district court offered mother an opportunity to participate in the trial. But mother continued the disruptive behavior that had previously led to her removal from the courthouse. Mother yelled in the courtroom, proclaiming that the child was "worth going to jail for" and that if her parental rights were terminated, she would "have nothing else to lose." Mother's

grandmother was in the courtroom and attempted to explain to mother that her rights to the child had not been terminated and that she needed to "[c]alm down."

Mother continued to demand that the district court rule on the termination petition immediately because she had "been waiting 14 months" to hear that her rights were being terminated. She told a courtroom deputy that "[y]ou can't bring me back down when I'm this triggered" and again asked the district court to make its decision on the spot so that she could "just leave." The district court attempted to explain that it was prepared to hear her evidence, but mother consistently interrupted the court. A courtroom deputy told mother that the deputy did not want to remove her from the courtroom but that she needed to "stay calm" because "[y]elling and screaming [was] not helping [her]."

In sum, the district court, courtroom deputies, and mother's grandmother all attempted to calm mother and encourage her participation when she appeared in the courtroom for the scheduled termination trial. But mother continued to scream, telling the deputies that she would not leave and that they would need to "[p]ut [her] in handcuffs then because that [was] the only way [they were] getting [her] out." The district court directed the deputies to remove mother from the courtroom, and the deputies escorted mother from the courtroom in handcuffs. After a brief recess, the district court made a record regarding mother's removal from the courtroom:

> [W]hen [mother] appeared in the courtroom after . . . she had been removed from the building due to her behavior, which included screaming at the deputies . . . because she did not want to go through security . . . it was [the district court's] intention to give her an opportunity to join the trial if she could be here calmly.

6

The district court noted that mother "quickly dysregulated" and that mother stated that "she [was] so amped up . . . that there [was] only one way she [was] leaving the building," which was in handcuffs. The district court proceeded with the trial in mother's absence, heard testimony from the assigned social worker and the guardian ad litem, and received 88 exhibits.

The district court issued an order terminating mother's parental rights based on the evidence presented at trial, concluding that the department had proved four statutory grounds for termination: (1) mother's neglect of parental duties, (2) mother's palpable unfitness, (3) mother's failure to correct conditions that led to the child's out-of-home placement, and (4) the child's status as neglected and in foster care.[2]

The district court made extensive findings in support of termination. It found that the child had been in relative foster care for 16 months at the time of trial; that the child had been the subject of prior juvenile-protection reports, including reports that mother and the child were living out of mother's car; that mother had hit the child with her hand on the child's right thigh, leaving a red welt; and that the child had witnessed domestic abuse perpetrated against mother. The district court noted mother's history of mental-health

---

[2] The child's father was also a party to the termination proceeding and had been served with the permanency petition by publication. He failed to appear at the October 2022 admit/deny hearing, and all subsequent proceedings. Despite the department's efforts, it was unable to contact father, and he was reportedly out of the country. The district court allowed the department to proceed against father by default and terminated his parental rights based on evidence presented at the trial.

7

issues, which reportedly included diagnoses of insomnia, unspecified mood disorder, anxiety, and post-traumatic stress disorder (PTSD).

The district court noted that the child was "engaging, energetic, and creative," but also prone to outbursts, as well as "dramatic and quick changes in mood." Those outbursts often led the child to shut down, retreat, and suck her thumb. The child was diagnosed with PTSD, which is "exacerbated by psychosocial stressors such as her upbringing away from her parents, witnessing domestic abuse, and a history of child abuse." Since entering relative foster care and starting therapy, many of the child's PTSD-related symptoms—such as anxiety, hiding or sleeping in her closet daily, and bedwetting—had decreased.

Despite the child's love for her parents, the district court found that the child's interactions with them often left her anxious, sad, and confused. The district court found that the child often misses mother but is "very anxious and potentially frightened to see [her]." In addition, mother's inconsistent participation in supervised visitation caused the child to react negatively. And when mother did visit, she often engaged in unpredictable, confrontational, and disrespectful behavior to the point that all visits with the child had to occur at a supervised visitation center because mother was deemed an "ongoing safety concern." For example, mother once asked the supervisor what would happen if she just "took" the child.

Despite being offered services, the district court found that mother had not only "fail[ed] to fully engage with her case plan, but she actively rejected the [d]epartment's efforts." Mother declined therapeutic services, parenting support groups, and domestic-violence programming. Mother's disinterest in treating her own mental-health needs

8

caused the district court to have "serious concern[s] about [mother's] willingness to support [the child's] mental health and well-being." Throughout the proceedings, mother was often unresponsive to the department's communications and was "verbally aggressive or hostile." The district court ultimately found that the department made reasonable efforts to reunify mother and the child, and that it was in the best interests of the child to terminate mother's parental rights.

Mother moved for a new trial and amended findings, arguing in part that the district court erred by admitting two of the trial exhibits. The district court denied that motion.

Mother appeals.

## ISSUES

I.     Did the district court err by granting mother's request to discharge her attorney?

II.    Did the district court violate mother's right to due process?

III.   Did the district court abuse its discretion by admitting certain exhibits?

IV.    Did the district court abuse its discretion by concluding that termination was in the child's best interests?

## ANALYSIS

Minnesota courts will terminate parental rights "only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). The petitioner bears "the burden of producing clear and convincing evidence that . . . [a] statutory termination ground[] exists." *In re Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988). A district court's decision in a termination proceeding must be based on evidence concerning the conditions that exist at the time of the termination. *In re Welfare of Child*

9

*of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007), *rev. denied* (Minn. July 17, 2007). Termination of a parent's rights is intended for those situations in which it appears "that the present conditions of neglect will continue for a prolonged, indeterminate period." *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn. 1980).

Minnesota law sets forth multiple statutory grounds for termination of parental rights. *See* Minn. Stat. § 260C.301, subd. 1(b) (2022). In a termination appeal, an appellate court examines the record to determine whether the district court applied the appropriate statutory criteria. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). In reviewing a termination order, we review the underlying findings of fact for clear error; we review a determination that a statutory ground for termination exists, as well as the court's ultimate decision to terminate parental rights, for an abuse of discretion. *In re Welfare of Child of J.H.*, 968 N.W.2d 593, 600 (Minn. App. 2021), *rev. denied* (Minn. Dec. 6, 2021). We will affirm a termination order if at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, so long as the department made reasonable efforts to reunite the family if reasonable efforts were required. *In re Welfare of Child. of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005).

Mother challenges the district court's termination order, alleging error as follows: (1) her waiver of counsel was invalid, (2) the district court violated her right to due process by continuing the trial on the termination petition in her absence, (3) the district court erred by admitting certain exhibits at trial, and (4) the district court's best-interests analysis is

insufficient to sustain the termination of her parental rights.[3] We address each allegation in turn.

**I.    The district court did not err by granting mother's request to discharge her attorney.**

Mother contends that she did not validly waive her right to counsel and that the district court therefore erred by granting her request to discharge her attorney. We will reverse a district court's finding of a valid waiver of the right to counsel in a termination proceeding only if it is clearly erroneous. *In re Welfare of G.L.H.*, 614 N.W.2d 718, 723 (Minn. 2000).

Parents have a statutory right to counsel in juvenile proceedings. Minn. Stat. § 260C.163 (2022). The relevant statute provides that a parent "has the right to effective assistance of counsel in connection with a proceeding in juvenile court as provided in this subdivision." *Id.*, subd. 3(a). The statute further provides:

> In all child protection proceedings where a child risks removal from the care of the child's parent . . . including . . . a termination of parental rights petition, . . . if the parent . . . desires counsel and is eligible for counsel under section 611.17, the court shall appoint counsel to represent

---

[3] Mother does not allege that the evidence was insufficient to sustain the statutory grounds on which the district court relied for termination or the district court's determination that the department made reasonable reunification efforts.

11

> each parent . . . prior to the first hearing on the petition and at all stages of the proceedings.

*Id.*, subd. 3(c). Minnesota Rule of Juvenile Protection Procedure 36.02, subdivision 2, embodies this statutory right to counsel.

In *G.L.H.*, the supreme court held that "[a] parent's waiver of her statutory right to counsel in termination of parental rights proceedings must be voluntary and intelligent" and that a "waiver's validity can be determined by examining the circumstances surrounding the case." 614 N.W.2d at 718. The parent in *G.L.H.* dismissed her court-appointed attorney on the day of her termination trial and later claimed that her decision to do so did not constitute a voluntary and intelligent waiver of her statutory right to counsel. *Id.* at 719. On appeal to this court, we applied a modified version of a criminal rule governing waiver of the right to counsel and held that the district court abused its discretion in allowing the parent to dismiss her court-appointed attorney and proceed pro se. *Id.* at 720. The supreme court reversed this court, reasoning that "[a]n analogy between waiver of the [statutory] right to counsel in TPR proceedings and [the constitutional right to counsel] in criminal proceedings fails to recognize that the creation of a statutory right, while deserving of protection, is not necessarily the equivalent of a constitutional right." *Id.* at 722-23.

The *G.L.H.* court concluded that the parent's waiver of counsel was valid because the district court asked the parent multiple times if she was certain about her decision, the parent had been represented by counsel in the case for one and one-half years, the parent had prior hearings in juvenile court, and the parent understood that if she waived her right

12

to counsel, she would have to proceed pro se and cross-examine her own witnesses. *Id.* at 720, 724.

The circumstances here are not fundamentally different from those in *G.L.H.*, where the supreme court determined that mother's waiver of counsel was valid. *Id.* The district court asked mother if she was sure that she wanted to discharge her attorney, and mother twice responded that she wanted to represent herself. The district court warned mother that if she discharged her attorney Adult Representation Services would not assign her a new attorney; instead, she would have to represent herself or find a new attorney on her own, to which mother responded, "Fire them all." The district court also warned mother that juvenile-protection matters are "very difficult to navigate" and that being a pro se litigant is "a tough challenge." Mother responded that she understood. In addition, mother had been represented by counsel for approximately nine months before discharging her attorney at the admit/deny hearing.

Moreover, mother had received the department's termination petition, which outlined the possibility that she may lose her parental rights to the child and that she had the right to file motions, present evidence, and examine witnesses. Finally, after mother waived her right to counsel, she sat at counsel table alone and addressed the district court directly, indicating that she had understood that she would be representing herself unless she retained a new attorney.

The surrounding circumstances of this case show that mother understood the relief sought by the department and the consequences of discharging her attorney, and that she made an informed and voluntary decision to waive her right to counsel.

13

Mother argues that she did not knowingly waive her right to counsel because the district court failed to adequately warn her of the consequences of the termination petition and that discharging counsel would require her to represent herself at trial. Mother asserts that the district court's warnings that juvenile-protection matters are "very complicated" and "difficult to navigate" were insufficient because the case had reached a "critical phase" at which the case could go to trial, resulting in the need for mother to present evidence, call witnesses, potentially testify, and cross-examine adverse witnesses.

Mother's invocation of a "critical phase" analysis is unavailing because that approach is used to assess the constitutional right to counsel in a criminal case. *See Friedman v. Comm'r of Pub. Safety*, 473 N.W.2d 828, 833 (Minn. 1991) (stating that the constitutional right to counsel does not attach in a criminal case until the prosecution reaches a "critical stage"). As the supreme court explained in *G.L.H.*, the procedures governing the exercise of a statutory right in a termination case and a constitutional right in a criminal case are not necessarily equivalent. *G.L.H.*, 614 N.W.2d at 723.

In sum, the district court did not err by granting mother's request to discharge her attorney.

**II.    The district court did not violate mother's right to due process.**

Mother contends that she was "denied due process when the district court proceeded in default, effectively barring [her] from exercising her trial rights and presenting a defense."[4]  Her argument has multiple parts, and we address each in turn.

*The Juvenile Rules*

Under the Minnesota Rules of Juvenile Protection Procedure, "if a parent . . . fails to appear for . . . a trial after being properly served with a summons . . . or a notice . . ., the court may receive evidence in support of the petition."  Minn. R. Juv. Prot. P. 18.01.  "If the petition is proved by the applicable standard of proof," the district court "may enter an order granting the relief sought in the petition as to [the parent who failed to appear]."  Minn. R. Juv. Prot. P. 18.02.

Mother argues that "[n]othing in [the default] rule allows the court to proceed in default when a parent appears for the hearing but is subsequently removed from the hearing."  In addressing this issue, the parties rely on rules of statutory construction.  *See In re Welfare of Child of R.K.*, 901 N.W.2d 156, 160 (Minn. 2017) (explaining that "[w]hen

---

[4] Caselaw distinguishes between due-process claims based on procedural violations and due-process claims based on violations of substantive due-process rights.  *See Boutin v. LaFleur*, 591 N.W.2d 711, 716-18 (Minn. 1999) (addressing separately the defendant's due-process claims based on procedural violations and violations of substantive due-process rights).  Procedural due process analyzes whether fair procedures were used in depriving an individual of life, liberty, or property.  *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  Substantive due process bars "certain arbitrary, wrongful government actions, regardless of the fairness of the procedures used to implement them."  *Boutin*, 591 N.W.2d at 716 (quotation omitted).  With the exception of one argument, in which mother relies on the standard used to assess a procedural due-process claim, mother does not specify whether her due-process claim is procedural or substantive.

15

interpreting rules of procedure, we look first to the plain language of the rule and its purpose," while reading rules together to ascertain their meaning (quotation omitted)).

Mother argues that the language of the default rule, "when applied to the facts of this particular case, is not ambiguous" and that "[m]other did not 'fail to appear' at the hearing." Mother notes that "[s]he was physically present at the hearing but removed from the hearing by the district court." Mother further argues that the district court's decision to proceed under the default rule was "contrary to the plain language of the rule which only allows the court to proceed in default when the parent 'fails to appear' for the hearing."

The department counters that the default rule is ambiguous and that it must be read in the context of Minnesota Rule of Juvenile Protection Procedure 38.04, which provides:

> The court may exclude from *any hearing any party* or participant, other than a guardian ad litem or counsel for any party or participant, only if it is in the best interests of the child to do so or *the person engages in conduct that disrupts the court.* The exclusion of any party or participant from a hearing shall be noted on the record and the reason for the exclusion given. *The exclusion of any party or participant shall not prevent the court from proceeding with the hearing or issuing a decision.* An order excluding a party or participant from a hearing shall be accessible to the public.

(Emphasis added.) Moreover, Minnesota Rule of Juvenile Protection Procedure 38.03 provides that "[t]he absence from a hearing of any party . . . shall not prevent the hearing from proceeding," so long as appropriate notice was provided.

Rule 38.04 allows a juvenile court to "exclude from any *hearing* any party or participant, other than . . . counsel for any party or participant" if "the person engages in conduct that disrupts the court." Minn. R. Juv. Prot. P. 38.04 (emphasis added). Hearings

16

in juvenile-protection matters are governed by Minn. Stat. § 260C.163. And Minn. Stat. § 260C.163 assumes that a trial is a type of hearing. *See* Minn. Stat. § 260C.163, subd. 1 (stating that "hearings on any matter shall be without a jury and may be conducted in an informal manner" and that "[i]n all adjudicatory proceedings regarding juvenile protection matters under this chapter, the court shall admit only evidence that would be admissible in a civil trial").

Related authorities also show that, for purposes of Minn. Stat. § 260C.163, a trial is a type of "hearing" under section 260C.163. *See In re Welfare of Child of K.K.*, 964 N.W.2d 915, 923 n.8 (Minn. 2021) (ruling that a parent's right "to cross-examine witnesses *appearing at the hearing*" under Minn. Stat. § 260C.163, subd. 8, applied to a TPR "trial," and assuming that TPR trials are a subset of the "hearings" covered by Minn. R. Juv. Prot. P. 38.01); *see also* Minn. Stat. § 260C.148, subd. 2(c) (2022) (noting that, in certain circumstances involving domestic child abuse, the juvenile court may continue its order "*pending trial under section 260C.163*" (emphasis added)); Minn. Stat. § 260C.178, subd. 1(j) (2022) (stating that, in certain circumstances, if the department attorney files a TPR petition, "*the court shall schedule a trial under section 260C.163* within 90 days of the filing of the petition" (emphasis added)).

In sum, rule 38 applies to "hearings," Minn. Stat. § 260C.163 governs "hearings," and Minn. Stat. § 260C.163 and related authorities show that "hearings" include trials.

Although the district court's order referred to the proceeding as one under rule 18, the default rule, we analyze mother's due-process claim under rule 38.04 because the circumstances of this case more precisely align with the circumstances described in that

17

rule. *Compare* Minn. R. Juv. Prot. P. 18.02 (allowing the district court to grant relief on a petition if a parent fails to appear for an admit-deny hearing, a pretrial hearing, or a trial), *with* Minn. R. Juv. Prot. P. 38.04 (allowing the district court to proceed with a hearing and issue a decision after excluding a parent from the hearing based on disruptive conduct).

*Forfeiture*

As a party to the termination proceeding, mother had a rule-based right to present evidence, cross-examine witnesses, and make arguments against the termination petition. Minn. R. Juv. Prot. P. 32.02(h)-(j). Mother also had a statutory right "to be heard, to present evidence material to the case, and to cross-examine witnesses appearing at the hearing." Minn. Stat. § 260C.163, subd. 8. Mother asserts that because she appeared at the courthouse for trial but was removed from the courtroom, the district court denied mother "her trial rights, her right to an adversarial proceeding, and her ability to effectively advocate on her own behalf as a self-represented litigant."

Under the forfeiture doctrine, which is well-established in criminal law, forfeiture of a constitutional right may result from a party's disruptive behavior. For example, the supreme court has said that the constitutional right to counsel may be forfeited. *State v. Jones*, 772 N.W.2d 496, 504 (Minn. 2009). "The rationale behind applying the forfeiture doctrine is that courts must be able to preserve their ability to conduct trials." *Id.* at 505. "[A] balance must exist between a defendant's right to counsel of his choice [and] the public interest of maintaining an efficient and effective judicial system." *Id.* at 505-06 (quotation omitted).

Similarly, a defendant will be found to have forfeited his constitutional right to confront the witnesses against him "if the state proves that the defendant engaged in wrongful conduct, that he intended to procure the witness's unavailability, and that the wrongful conduct actually did procure the witness's unavailability." *State v. Wright*, 726 N.W.2d 464, 479 (Minn. 2007) (quotation omitted). Defendants in a criminal trial "have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system." *Id.* (quotation omitted).

And this court has held that "[a] criminal defendant forfeits his right to court-appointed counsel when he assaults his court-appointed attorney." *State v. Lehman*, 749 N.W.2d 76, 78 (Minn. App. 2008), *rev. denied* (Minn. Aug. 5, 2008). We explained that "[t]he district court did not abuse its discretion by determining that appellant had forfeited his right to an attorney by attacking his public defender in open court" and that "*[n]o court can carry on its business in an atmosphere of violence, fear, and intimidation.*" *Id.* at 82 (emphasis added) (footnote omitted).

In sum, the policies that justify forfeiture of certain constitutional trial rights in the context of a criminal proceeding include the following: preservation of the district court's ability to conduct trials; maintenance of an efficient and effective judicial system; prevention of conduct that destroys the integrity of the trial system; and prevention of an atmosphere of violence, fear, and intimidation in the courtroom. Those policies are equally important in the context of a juvenile-protection proceeding, in which the law mandates prompt decisions regarding the permanent placement of children who have been abused or neglected, and the entire process must be viewed through the eyes of a child. *See In re*

19

*Welfare of Child of R.D.L.*, 853 N.W.2d 127, 135 (Minn. 2014) ("Under our law, children are not to be kept waiting, uncertain who will raise them or where they will grow up."). "While we recognize and support due process rights of all parties, we decline the invitation to elevate the parents' rights at the expense of the child's." *In re Welfare of J.R., Jr.*, 655 N.W.2d 1, 5 (Minn. 2003).

Rule 38.04—which authorizes the district court to exclude a parent from a hearing, to proceed with the hearing in the parent's absence, and to issue a decision—embodies the forfeiture doctrine: a parent may lose the right to participate in a termination hearing if the parent's disruptive conduct justifies the parent's exclusion from the hearing. Given that the policies supporting the forfeiture doctrine outweigh a defendant's exercise of certain constitutional trial rights in a criminal proceeding, those policies also outweigh a parent's exercise of statutory- and rule-based trial rights in a juvenile-protection proceeding. *See G.L.H.*, 614 N.W.2d at 723 (explaining that a statutory right in a juvenile-protection case is given less protection than an analogous constitutional right in a criminal case).

Mother does not dispute that her conduct disrupted the court and warranted her removal from the trial. As a result of that conduct, mother forfeited her participation rights. Nor does mother dispute that the district court complied with the requirement of rule 38.04 that the exclusion of any party from a hearing and the reason for the exclusion must be noted on the record. Thus, the district court's ensuing termination order, which was based on the evidence presented at the trial, was authorized under rule 38.04.

20

*Lack of Warning*

Mother argues that the district court violated her right to due process because it failed to advise her that she would be removed from the courtroom based on her behavior, that the trial would continue in her absence, and that she would lose her ability to present a defense against the department's petition.

The plain language of rule 38.04 does not require the district court to provide a disruptive parent with advance warning before excluding the parent from a hearing. Minn. R. Juv. Prot. P. 38.04. But we need not determine whether due process requires a warning before exclusion under rule 38.04 because the record shows that a courtroom deputy warned mother that the deputy did not want to have to remove her from the hearing based on her behavior. Moreover, the district court had previously removed mother from her admit/deny hearing on the termination petition, and deputies had removed mother from the courthouse on the morning of her trial, based on similar disruptive conduct. On this record, we are satisfied that mother was on notice that her disruptive behavior could lead to her removal from the hearing.

*Continuance*

Mother also argues that it "would have been appropriate for the district court to reschedule the hearing." We disagree. A continuance based on mother's disruptive behavior would have conflicted with laws mandating timely permanency decisions. Minn. R. Juv. Prot. P. 5.01 ("[T]he court may continue a scheduled hearing or trial to a later date so long as the timelines for achieving permanency as set forth in these rules are not delayed."). Moreover, continuing a termination trial to a new date in response to a parent's

21

disruptive conduct would enable the parent to avoid termination and to inappropriately delay a permanent-placement determination.

"Each delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home and can seriously affect a child's chance for permanent placement." *J.R.*, 655 N.W.2d at 5 (recognizing "that time for a child is different than time for adults" because "from a child's view, a delay is a delay regardless of the reason" and "this uncertainty can permanently damage a child's development of trust and security" (quotation omitted)). Thus, a continuance is not the solution to behavior that disrupts a termination trial.

*Pro Se Status*

Finally, mother argues that because rule 38.04 does not allow removal of "counsel for any party" and she was acting as her own counsel, the district court was precluded from excluding her from the termination trial. The term "counsel" is defined as "[o]ne or more *lawyers* who, having the authority to do so, give advice about legal matters." *Black's Law Dictionary* 439 (11th ed. 2019) (emphasis added). The term "lawyer" describes "[s]omeone who, having been licensed to practice law, is qualified to advise people about legal matters." *Id.* at 1063.

It is undisputed that mother is not a lawyer. Mother is a "party" to this proceeding, and she discharged her "counsel" at the admit/deny hearing. Mother therefore did not have "counsel" at the termination trial. Mother's resulting status as a pro se party did not make her counsel for any party, such that rule 38.04 prevented the district court from excluding

22

her from the trial.[5]  *See id.* at 1476 (defining "pro se" as "[f]or oneself; on one's own behalf; *without a lawyer*" and "[o]ne who represents oneself in a court proceeding *without the assistance of a lawyer*" (emphasis added)).

Treating a pro se party as "counsel" under rule 38.04 would make any pro se litigant in a termination proceeding immune from removal, even if the party engages in conduct that disrupts the court.  If a person acting as her own attorney without being licensed as an attorney cannot be removed from the courtroom for disruptive conduct, a parent could inappropriately delay proceedings intended to determine a child's best interests by forgoing counsel and engaging in disruptive conduct.  Once again, that approach is inconsistent with laws requiring prompt permanent-placement decisions for abused and neglected children, as well as the purposes of juvenile protection provisions of the Juvenile Court Act.  *See* Minn. Stat. § 260C.001, subd. 3(2) (2022) (stating that one purpose of the laws relating to termination of parental rights is "to secure for the child a safe and permanent placement" "if placement with the parents is not reasonably foreseeable").

---

[5] In *K.K.*, the supreme court held that when taking the testimony of a child at a termination trial informally under Minn. Stat. § 260C.163, subd. 6, "the district court cannot exclude a parent's attorney from that testimony when excusing the presence of the parent under Minn. Stat. § 260C.163, subd. 7."  964 N.W.2d at 916.  The father in *K.K.* was a pro se party and "assert[ed] that references to 'attorney' or 'counsel' in subdivisions 6 and 7 of section 260C.163 must be read to encompass the right of a self-represented parent to participate [in a hearing] and cross-examine witnesses."  *Id.* at 919 n.5.  The supreme court did not address that assertion because father did not raise it in district court or before this court on appeal.  *Id.*  In addition, the circumstances in *K.K.* did not involve a parent's exclusion from a hearing under rule 38.04 based on conduct that disrupted the court.  *See id.* at 917 ("In the trial held in this case on Winona County's petition to terminate parental rights, the district court took the child's testimony informally, excusing the parents and attorneys while the judge questioned the child with the child's guardian ad litem present.").

*Voidness*

Mother argues that the order terminating her parental rights is "void for lack of due process." As to that argument, the supreme court has said, in the context of a termination proceeding, that:

> It is well settled that where the [district] court has jurisdiction of the offense and of the defendant a judgment will be held void for want of due process only where the circumstances surrounding the trial are such as to make it a sham and a pretense rather than a real judicial proceeding. Here, there is no dispute that the district court had both personal and subject-matter jurisdiction. It is also clear that the circumstances surrounding the default judgment against Coats did not constitute a sham or pretense such that the default judgment was void. To the contrary, the record reveals that the court took evidence and was focused on the welfare of four children who were freed for adoption after waiting for over a year in the limbo of foster care while their mother repeatedly failed at the program that would have brought them home. Accordingly, we hold that the default judgment is not void for lack of due process.

*In re Welfare of Child. of Coats*, 633 N.W.2d 505, 512 (Minn. 2001) (quotation omitted).

Although the supreme court's statement regarding due process in *Coats* was technically dicta, the supreme court reiterated its position in a subsequent termination case, *In re Welfare of L.W.*, stating:

> [C]onsistent with this court's decision in *Coats,* the default judgment terminating L.F.'s parental rights did not violate due process. The district court conducted an evidentiary hearing on the petition to terminate parental rights and heard testimony from L.F.'s social worker, the guardian ad litem, and L.F.'s mother, all of whom testified in support of termination of L.F.'s parental rights. The district court's decision to terminate parental rights was based on L.F.'s failure to correct the conditions leading to out-of-home placement and her neglect of L.W. while L.W. was in foster care, not on L.F.'s failure to

24

> appear. As in *Coats*, the circumstances of the default proceeding "did not constitute a sham or a hoax" and it was "a real judicial proceeding."

644 N.W.2d 796, 797 (Minn. 2002) (quoting *Coats*, 633 N.W.2d at 512).

The due-process standard articulated in *Coats* and *L.W.* related to proceedings conducted in a parent's absence after the parent failed to appear for a hearing. We discern no reason not to apply that same standard to a termination trial conducted in a parent's absence after the parent was excluded from a hearing for disruptive conduct.

Like the circumstances in *Coats* and *L.W.*, the hearing in this case did not constitute a sham or a hoax; it was a real judicial proceeding. The district court heard testimony regarding mother's abilities and the child's needs from the social worker who had been assigned to the case, as well as the assigned guardian ad litem. And the district court received 88 exhibits relevant to a determination regarding potential statutory grounds for termination, reasonable efforts for reunification, and the best interests of the child. Finally, the district court's termination order is based on its application of the relevant statutory standards to the evidence presented at the hearing, and not on mother's exclusion from the hearing. *See L.W.*, 644 N.W.2d at 797 ("The district court's decision to terminate parental rights was based on L.F.'s failure to correct the conditions leading to out-of-home placement and her neglect of L.W. while L.W. was in foster care, not on L.F.'s failure to appear.").

In sum, the district court's decision to terminate mother's parental rights to the child is not void for lack of due process.

*Procedural due process*

Mother also argues that "[t]he improper procedures used in this case violated [her] right to procedural due process" under the due-process analysis set forth in *Mathews v. Eldridge*, which considers:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976).

As to the private interest at stake, "a parent's right to make decisions concerning the care, custody, and control of his or her children is a protected fundamental right." *R.D.L.*, 853 N.W.2d at 133. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is [] a commanding one." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982) (quotation omitted).

Mother argues that the risk of erroneous deprivation of her parental rights was high because:

> Not only was mother unrepresented, but she was not allowed to be present at the hearing, not allowed an opportunity to return to the hearing, and not allowed a continued hearing at which she could defend her parental rights. She had no opportunity to adequately contest the allegations against her, present evidence as to the [department's] provision of reasonable efforts, or provide important insight on the best interests of [the] child. [Therefore,] [s]he was barred from exercising any of her trial rights.

26

To be clear, we do not characterize the district court as having "barred" mother from exercising any of her trial rights. The record shows that the district court was willing to allow mother to exercise those rights, but mother refused to behave in a manner that would have allowed her to do so. The record also shows that the district court had no reasonable option other than exclusion. Indeed, the district court exercised great patience when faced with mother's challenging behavior.

Mother argues that the use of the following substitute procedural safeguards would have reduced the "high" risk of erroneous deprivation of her parental rights: further inquiry into her decision to waive counsel, continuing the hearing, advising mother that she would be allowed to return to the hearing if she were no longer disruptive, warning mother that her behavior could be grounds for removal and proceeding with the hearing in her absence, having mother appear through remote technology, and appointing standby counsel. Mother argues that the "probable value of these procedures is high." For the following reasons, we disagree.

First, there is no right to, or authority for, the appointment of standby counsel in a juvenile-protection proceeding. Second, on this record, there is no reason to think that mother would have cooperated with any of the suggested procedural safeguards. Third, mother has not explained what evidence she would have presented or what challenges she would have made to change the outcome at trial. In fact, the record does not suggest that mother was interested in participating in a hearing conducted in compliance with the procedures set forth in statute and rule. Instead, mother demanded that the district court rule on the department's petition immediately so that she could "just leave" because she

had "been waiting 14 months" to hear that her rights to the child were being terminated. And mother made it abundantly clear that she would continue to be disruptive until she was removed in handcuffs, stating, "You can't bring me back down when I'm this triggered."

On this record, there is no basis to conclude that there was a high risk of an erroneous deprivation of mother's parental rights or that the suggested substitute procedures would have reduced any such risk.

Finally, the government's interest in protecting children from abuse and neglect is high. *In re Child of P.T.*, 657 N.W.2d 577, 588 (Minn. App. 2003). Mother argues that "all parties to a juvenile protection proceeding share an important interest in ensuring the best interests of the child are met through accurate and just proceedings." We agree. But accurate and just proceedings are not possible if a party is allowed to disrupt the proceedings.

On balance, we discern no procedural due-process violation under the analytical framework of *Mathews v. Eldridge*.

*Summation*

We hold that the order terminating mother's parental rights was properly issued under the procedure set forth in rule 38.04. Thus, arguments concerning the district court's application of rule 18—the default rule—and the meaning of the phrase "fails to appear" are immaterial and do not provide a basis to reverse. *See In re Welfare of Child of A.H.*, 879 N.W.2d 1, 6 (Minn. App. 2016) ("[W]e will not reverse a correct decision simply

because it is based on incorrect reasons.") (quotation omitted). We further hold that use of the procedure set forth in rule 38.04 did not violate mother's right to due process.

Because mother has not established that the district court used an improper procedure or otherwise violated her right to due process, we do not consider mother's argument that the denial of her right to counsel, her right to self-representation, and her right to testify are structural errors that "defy analysis by harmless-error standards." *See State v. Dorsey*, 701 N.W.2d 238, 252 (Minn. 2005) (quotation omitted).

## III. Mother did not preserve her assignment of error to the district court's admission of certain exhibits.

Mother contends that the district court abused its discretion by admitting the child's diagnostic assessment and mother's psychological assessment as business records, arguing that the department did not provide adequate foundation for those records.

District courts have broad discretion in deciding whether to admit or exclude evidence. *See In re Welfare of Child of J.B.*, 698 N.W.2d 160, 172 (Minn. App. 2005), *petition for rev. dismissed* (Minn. May 3, 2005) (stating "[e]videntiary rulings are discretionary with the district court"). "A new trial may be granted on the basis of an improper evidentiary ruling only if the appellant demonstrates prejudicial error." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 93 (Minn. App. 2012). Failure to object to evidence at trial results in waiver of appellate review. *Id.* at 97. If "allegedly improper or prejudicial evidence has been admitted without objection, a party may not object to its admissibility for the first time in a motion for a new trial or on appeal." *Id.* at 96 (emphasis

29

omitted) (quotation omitted) (concluding that failure to object at trial to the admission of an email received by the child's caseworker resulted in waiver of the issue on appeal).

Mother was properly excluded from the termination trial based on her disruptive behavior. Thus, she did not object to the admission of any exhibits at trial. Instead, she raised her objections for the first time in her posttrial motion for a new trial, which was too late. As a result, mother failed to preserve her evidentiary objections and cannot now challenge the district court's admission of the child's diagnostic assessment and mother's psychological assessment as business records.[6] *See id.*

**IV. The district court's best-interests analysis is sufficient to permit appellate review and to sustain the termination order.**

If a statutory ground for termination of parental rights is proved, the paramount consideration in determining whether parental rights should be terminated is the child's best interests. Minn. Stat. § 260C.301, subd. 7. Thus, a district court's order terminating parental rights must include a finding that termination is in the child's best interests. *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009). "The 'best interests of the child' means all relevant factors to be considered and evaluated." Minn. Stat. § 260C.511(a) (2022).

_____

[6] Nonetheless, we note that appellate courts have upheld the admission of reports such as those at issue here. *In re Welfare of Brown*, 296 N.W.2d 430, 433, 435 (Minn. 1980) (stating that the psychologist's report of the child's emotional condition was admissible as a business record, and that the social worker, who kept the report in her file, as part of her business practice, was a proper foundational witness); *In re Welfare of J.K.*, 374 N.W.2d 463, 467 (Minn. App. 1985) (stating that "reports of social workers and psychologists are admissible as business records"), *rev. denied* (Minn. Nov. 25, 1985).

A best-interests analysis is expressly governed by Minn. Stat. § 260C.301, subd. 7. That statute requires consideration of three factors: "(1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004) (quotation omitted); *see* Minn. R. Juv. Prot. P. 58.04(c)(2)(ii) (requiring district court to address these factors in a termination proceeding).

Because a determination of a child's best interests "is generally not susceptible to an appellate court's global review of a record" and involves credibility determinations, the district court must "explain its rationale in its findings and conclusions." *In re Tanghe*, 672 N.W.2d 623, 625-26 (Minn. App. 2003). "We review a district court's ultimate determination that termination is in a child's best interests for an abuse of discretion." *In re Welfare of Child. of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *rev. denied* (Minn. Jan. 6, 2012); *see also In re Child of Evenson*, 729 N.W.2d 632, 635 (Minn. App. 2007) (stating that in a child-custody matter, "the law leaves scant if any room for an appellate court to question the district court's balancing of best-interests considerations" (quotation omitted)), *rev. denied* (Minn. June 19, 2007).

Mother argues that the court made insufficient findings regarding mother's interest and the child's interest in maintaining the parent-child relationship. She also argues that the testimony of the assigned social worker and guardian ad litem was insufficient to support a finding that termination was in the child's best interests. Mother complains that the social worker's testimony that the child "deserves permanency" and "stability," and the

31

guardian ad litem's testimony agreeing that the child's "need for a permanent, stable, and safe parenting situation outweighs [the child's] interest in maintaining the parent-child relationship," were conclusory.

The district court recognized that its best-interests analysis was governed by Minn. Stat. § 260C.301, subd. 7. The district court noted that mother would not be able to care for the child in the reasonably foreseeable future because she had failed to comply with her case plan for the preceding 16 months, to address her own mental-health issues, and to accept responsibility for the negative impact her actions had on her child. The district court determined that it was in the child's best interests to be with a caregiver who could provide a stable and permanent home environment, make the child a priority, and understand the child's trauma and mental-health needs.

Although the district court emphasized the competing-interests factor, it considered mother's interests as well. The district court also credited the guardian ad litem's testimony that the child was deserving of a stable home, that a transfer of custody was not a safe option for the child, and that mother was unlikely to demonstrate the behavioral changes necessary to parent the child.

This case is distinguishable from cases in which we previously reversed best-interests determinations. For example, in *In re Welfare of Child of D.L.D.*, we reversed and remanded the district court's order terminating parental rights because the court had not made best-interests findings. 771 N.W.2d at 540. Similarly, in *In re Welfare of Child of J.R.R.*, we reversed the district court's decision that termination was in the best interests of the child because the underlying findings were not adequately supported, given

32

that the child and the guardian ad litem's position was that termination was *not* in the child's best interests. 943 N.W.2d 661, 669 (Minn. App. 2020).

In this case, the district court cited the applicable statutory standard, made findings relevant to that standard, the findings are supported by the record, and the findings adequately convey the district court's rationale: the child's need for stability and care outweighed any interest that mother and the child had in maintaining the parent-child relationship. The district court did not abuse its discretion by determining that termination was in the child's best interests.

## DECISION

The district court did not err by allowing mother to discharge her attorney and proceed without counsel. Nor did it err by excluding mother from the termination trial based on her disruptive conduct in the courtroom at the beginning of trial. Under the circumstances, rule 38.04 authorized the district court to proceed with the trial and to issue a decision despite mother's absence, and doing so did not violate mother's right to due process. As a result of mother's exclusion, she failed to preserve her evidentiary objections for review on appeal. Finally, the district court did not abuse its discretion in determining that termination was in the child's best interests.

**Affirmed.**